# DENNIS WISE v. STATE OF MARYLAND

[No. 674, September Term, 1980.]

*Decided February 6, 1981.*

The cause was argued before GILBERT, C. J., and MOORE and LOWE, JJ.

*Howard L. Cardin* for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Leslie Stein, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Dennis Wise has appealed his conviction of the first degree murder of James Reid after having been tried by a jury in the Criminal Court of Baltimore. Wise had previously been indicted for having conspired to murder, and for having murdered, James Reid in Baltimore City. He had also been charged with having conspired (in Baltimore City) to murder B. A. Addison in New York City. Whether appellant consummated that act in New York has yet to be determined although appellant agreed to waive extradition at the conclusion of his Maryland problems.

The State's theory was that Mr. Wise's conspiracies were in the nature of contracts to kill and that in these two instances he fully performed. It believed that Mr. Wise had been hired by one Gilbert Wiley to kill the victims because they had raped and robbed Derochea Leak, a girlfriend of

Wiley who was a major narcotics dealer and who kept much of his profit in the apartment he rented for her. At least one of the victims, along with two unidentified persons, went to the apartment to steal both drugs and profits and inferentially also intending to assault Ms. Leak, which they did.

Wiley and Leak then contacted an acquaintance, Harry Lockwood, presumably to have Lockwood find the perpetrators of the crimes. As to Addison he succeeded, notifying Wiley that Addison was in New York. The next day appellant arrived in New York, told Lockwood that "Gil sent me" and shot Addison after Lockwood had pointed him out.

It did not appear, however, that Wiley had used Lockwood as a middleman in disposing of Reid. Reid was killed not for his actual participation in the theft and assault, but rather because he was suspected by Wiley of having planned it. Apparently, the deaths of both were arranged at about the same time and for the same underlying reasons.

The two conspiracy cases were tried and concluded in September of 1979. The Reid murder case was also commenced at that time. The trials of Wise were joined with those of Wiley, obviously because they were allegedly the contracting partners in both instances and thus, the primary conspirators. Ms. Leak, who was to testify for the State, became the vortex of a plethora of procedural and evidentiary problems even before the trial actually commenced, and so remained throughout since her testimony regarding the conspiracies was essential — but admissible only if she were a conspirator.

When the cases were called, among the pending defense motions were those to sever the Reid and Addison conspiracy charges. Yet when appellant raised the severance issue prior to jury selection, he could not decide whether to fish or cut bait. He conceded that

> ". . . at this point we are not entitled to a severance because we have no grounds that we can give the court to indicate, as such, a severance."

Because of a conversation with Ms. Leak, however, he expressed the conviction that the State's evidence would show that rather than there having been two conspiracies to kill two people, there was in fact but one conspiracy to kill two people and that, somehow, this would entitle him to a severance at the end of the State's case for which he contended he could not be retried upon the second case for double jeopardy reasons. He suggested that the court defer its ruling until the end of the State's case, as was done in *Ellerba v. State,* 41 Md. App. 712, 728, *cert. denied,* 285 Md. 729, 734 (1979). Hesitantly, although seemingly acquiescently, the trial judge formally denied the severance on the information he had at that time, but suggested that counsel was free to renew the motion at the end of the State's case if it felt it proper to do so in light of the evidence elicited.

At the end of the State's case it was Ms. Leak's testimony that again brought on procedural and evidentiary difficulties. The first of a series of defense motions was to "suppress"[1] Ms. Leak's testimony as hearsay evidence of the conspiracies, without which the State conceded it had no case. The State stood upon the premise that her testimony was admissible because she was a part of the conspiracy, *i.e.,* a "co-conspirator." After substantial agonizing, the court held that there was sufficient evidence to indicate that she had conspired in the death of Addison, but, while privy to the plan to kill Reid, there was no evidence that she had participated in his negotiated departure. Her testimony, as it related to the Reid conspiracy, was therefore "suppressed."

There followed defense motions for judgment of acquittal in all cases, but only one was granted, *i.e.,* as to the Reid conspiracy — there having been insufficient evidence without Ms. Leak's testimony. Appellant then moved for mistrial of both the Addison conspiracy and the Reid murder. The court denied these motions. Immediately appellant moved to sever the two charges remaining against

---

[1]. This motion, though referred to by counsel as a motion to suppress, was obviously intended by counsel, and accepted by the court, as a motion to strike the testimony.

appellant, that is, conspiracy to murder Addison and the murder of James Reid. Because they were separate and distinct crimes, the court granted the motion.

Acknowledging that he may have been somewhat premature because the State had not been called upon to elect where it "was going with the case," appellant then revived his motion for mistrial:

> ". . . the specific reason for the renewal of the motion for mistrial is that if the State proceeds on the Addison conspiracy, then the evidence the jury heard this morning, I would submit is completely inadmissible, that is, statement about the murder of Reid and the res gestae statement of Dale Streams which came in through Officer Mallinoux, I believe would be absolutely inadmissible. If on the contrary the State elects to proceed with the murder of Mr. Reid, then I believe that the testimony of Mr. Lockwood would be completely inadmissible in that case, and as such I believe that no matter which case the State would elect to pursue at this time that there has been evidence produced, a significant amount of evidence, prejudicial evidence that no curative instruction could remove this prejudice from the jury, and in such the Court should grant the mistrial."

The court again denied the motion but called upon the prosecutor to "elect which of the two charges against Mr. Wise he want[ed] to proceed with." Because it was more reasonable to keep both alleged conspirators in the same trial (*i.e.,* Wiley and Wise), the State chose to proceed with the conspiracy to kill Addison. While it would seem that the evidence of the Reid murder previously produced by the State might have prejudiced the jury against appellant in the Addison conspiracy, it obviously did not because on September 27, 1979, the jury found appellant not guilty of so conspiring.

On October 15, 1979, appellant moved to dismiss the Reid murder charge on grounds of double jeopardy, among others.

The motion was heard and denied on January 23, 1980, and the case was set for trial and tried on March 11, 1980, 30 days having been provided appellant in which to appeal the double jeopardy denial.

From the time of his arrest on March 6, 1979, appellant repeatedly sought a speedy trial individually and through diligent efforts of his attorney. He asserts a denial of that constitutional right as an issue on appeal here, just as he contends that his conviction was improper as he was twice exposed to jeopardy. Neither of those direct assertions of constitutional violation gives us but slight pause under the facts of this case.

### —collateral estoppel—

The primary issue raised by appellant is an amalgam of evidentiary and constitutional issues, and as indicated below, it again focuses on Derochea Leak. Her testimony was crucial not only to prove that Wise killed Reid, but also that he did so premeditatedly. She was to testify primarily about conversations with Gilbert Wiley regarding his having hired Wise to kill Reid, then circumstantially support that hearsay with her own observations, as would the State with other evidence. But such conversations were inadmissible hearsay unless they could come in through some exception to the hearsay rule.

The State proffered two exceptions to avoid the hearsay stymie. It contended that Ms. Leak was a co-conspirator together with Wiley and Wise; however, the Reid conspiracy acquittal was expressly predicated upon a finding by the trial judge as a matter of law that she was *not* a conspiratorial participant in the Reid case. Furthermore, since a jury had acquitted Wise of conspiracy to kill Addison in New York, the "ultimate fact" that there was no conspiracy could not be relitigated. *Powers v. State,* 285 Md. 269, *cert. denied,* 444 U.S. 937. This is precisely what the trial judge hearing the murder case ruled preliminarily, and the record indicates he carried out his resolve. No hearsay evidence was offered, or if offered, it was not admitted.

Appellant does not assert any violation of the hearsay rule; however, he sought before and during the murder trial to preclude *any* evidence which had been introduced in the previous conspiracy trials.

> "But the Court left one little phrase out that bothers me. That is why I am asking the Court now for a more explicit ruling. The Court indicated the State cannot bring in hearsay. I understand that.
>
> My suggestion or my argument is the State cannot bring in any evidence of the conspiracy either, that that has already been litigated between the parties and therefore cannot be brought in.
>
> Now, the question or the point I am coming to is the robbery, for example, of Derochea Leak. That is all part of a conspiracy. Whether she was robbed or not has nothing to do with whether Mr. Wise killed Jamey Reid other than to show the beginning of a conspiracy between Wise and Wiley. That is Derochea Leak is attacked, Wiley then hires Wise.
>
> They have been acquitted of that. Therefore in my opinion and what I am arguing to the Court, there can't be any reference to that. That issue has been litigated. There can be no reference to that conspiracy. Not just the hearsay exception, but any reference to it whatsoever."

He now embellishes his objections upon appeal by contending that the doctrine of collateral estoppel — "kissin' cuzzin" to res judicata — precluded *any* evidence which had been considered by the acquitting jury. This argument is predicated upon the gist of *Ashe v. Swenson,* 397 U.S. 436, 443 (1970), which is that:

> " 'Collateral estoppel' . . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

The decision in *Ashe v. Swenson,* which incorporated collateral estoppel into the constitutional protection against double jeopardy, raises the question of whether double jeopardy precludes the evidentiary use of crimes for which there has been a prior acquittal, or whether the doctrine applies only in situations of reprosecution. Although one might read "intimations" into *Ashe v. Swenson* that the constitutional incorporation of collateral estoppel goes beyond reprosecution, the fact situation presented in that case related solely to reprosecution and did not stretch the constitution further into the field of evidence.

At least two federal circuit courts of appeal appear to have held that the Constitution demands the exclusion of evidence of crimes of which the defendant has been acquitted: *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir. 1972), and *United States v. Mespoulede,* 597 F.2d 329 (2d Cir. 1979). But both of these cases stress the relitigation of *an issue* decided theretofore in an accused's favor. *Wingate* could perceive no distinction in quality between relitigating an "ultimate" fact and an "evidentiary" fact which had been once decided in an accused's favor. *Id.* at 213-14. Significantly, its reasoning followed expressly Judge Friendly's language in *United States v. Kramer,* 289 F.2d 909 (2d Cir. 1961), which stated that:

> " 'The Government is free within the limits of the Fifth Amendment, . . . to charge an acquitted defendant with other crimes claimed to arise from the same or related conduct; but it may not prove the new charge by asserting *facts necessarily determined against it* in the first trial, no matter how unreasonable the Government may consider that determination to be.' " *Wingate, supra* at 214, *quoting from Kramer, supra* at 916. (Emphasis added).

Although some jurisdictions have held that the theory underlying res judicata is confined to ultimate facts and does not extend to evidentiary ones, *e.g., State v. Thompson,* 241 Iowa 16, 39 N.W.2d 637 (1947), Maryland has never decided

specifically whether collateral estoppel goes beyond multiple or fragmented prosecutions. See generally Annot., 9 ALR3d 203, 228 et seq. (1966). A recent and exhaustive case from the Court of Appeals (*Powers v. State, supra*) while not deciding the question, clearly indicates that it will interpret *Ashe v. Swenson, supra,* as not distinguishing between ultimate facts and evidentiary facts for purposes of relitigation. We hasten to caution, however, that the same case also clearly indicates that it will apply the limitations that were explicit in Judge Friendly's admonitions.

In *Powers v. State, supra,* Judge Davidson carefully analyzed all of the relevant Supreme Court cases relied upon by appellant (among others) interpreted in the light of a multitude of jurisdictional analyses. While *Powers* did not turn upon whether collateral estoppel precluded relitigation of evidentiary facts, its statement of purposes of that doctrine seems quite clearly to indicate that it will apply to evidentiary facts but also, more importantly, that it will apply only to those "necessarily determined."

"One of the purposes of the doctrine of collateral estoppel is to prevent prosecutors from purposefully using their powers to provide plural opportunities to convict an accused. *Ashe v. Swenson,* 397 U.S. at 445 n. 10, 90 S. Ct. at 1195 n. 10. Another is to encourage care in the preparation and presentation of the prosecutor's initial case in order to prevent relitigation which overburdens already crowded dockets and wastes public funds. Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions,* 74 Harv. L. Rev. 1, 32 (1960). The primary purpose of the doctrine of collateral estoppel, however, is to avoid compelling an accused to prove his innocence to two or more juries. More precisely, *the doctrine's purpose is to avoid compelling relitigation of a fact material to the question of innocence when it appears substantially certain that a jury has already decided that fact in the accused's favor." Id.* at 287 (Emphasis added).

That same limitation appears in every case cited by appellant and notably in those upon which he especially relies, *Turner v. Arkansas,* 407 U.S. 366 (1972); *Simpson v. Florida,* 403 U.S. 384 (1971), and *Sealfon v. United States,* 332 U.S. 575 (1948) (his mainstay), as well as *Wingate* and *Kramer,* both *supra.*

A recent case in the Third Circuit found it unnecessary to address whether collateral estoppel constitutionally barred the evidentiary use of conduct of an accused for which he had been acquitted because that circuit had so applied the doctrine long before *Ashe v. Swenson* (1970), in *United States v. Simon,* 225 F.2d 260 (3d Cir. 1955), and even before *Sealfon* (1948), in *United States v. De Angelo,* 138 F.2d 466 (3d Cir. 1943). It held that however *Ashe v. Swenson* was interpreted, it surely did not *proscribe* extending the doctrine as that circuit had previously extended it. That case, *United States v. Keller,* [1980], 27 Crim. L. Rep. (BNA) 2294 (3d Cir. May 23, 1980), is significant in that it seems to carry the doctrinal application to evidence, even beyond the Friendly limitations of facts "necessarily determined," which we indicated appeared implicit in *Powers* and all of the cases therein discussed.

In *Keller* the accused and others were charged with conspiracy to distribute PCP. Keller admitted his participation but testified that he had been entrapped because he was cajoled and persuaded to do so by, for and at the behest of a government informer. The government sought to undercut that testimony by cross-examining the defendant about his involvement in drug deliveries at different times, for which transactions he had been acquitted as a result of an entrapment defense. The court allowed no evidence of the accused's conduct which had been the subject of the prior acquittal. Significantly, the court noted:

> "The government argue[d] . . . that this case is distinguishable from the situations previously before this court because Keller did not deny the fact of his participation in the drug distributions but claimed that he was excused from criminal

> prosecution because he was entrapped. The Government contends that collateral estoppel is inapplicable because '[i]t is not the result of the prior case that was material, but rather the facts which were undisputed.' Thus, the Government would have us hold that the prior conduct is admissible notwithstanding the determination by the earlier fact finder that the defendant's state of knowledge and level of participation did not satisfy the requirement of the criminal law. * * * We decline to so hold since that would eviscerate the effect of the prior acquittal. We agree with the Fifth Circuit that '[i]t is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit.' *Wingate v. Wainwright,* 464 F. 2d at 215. The Government position 'places an unjust burden on a defendant to require him to relitigate the very issue a jury decided in his favor.' *U.S. v. Mespoulede,* 597 F. 2d at 334." *Keller, supra* at 2295-96.

That is but a tiny step from holding that *no* evidence introduced in a case resulting in an acquittal may ever be used in a subsequent prosecution for any purpose — but even there it does fall short of that extreme. We cannot believe that any jurisdiction would close that last gap, especially in conspiracy cases and their underlying crimes. We are certainly satisfied that Maryland would not. If such broad interpretation were placed upon the doctrine of collateral estoppel, it could not stand together with the well-established principle that an acquittal of a conspiracy to commit a crime does not bar a subsequent prosecution of the crime. *See* Annot., 92 L. Ed. 185, 188 (1949). *See, also, Sealfon v. United States, supra* at 578-79.

A conspiracy is a corrupt combination to accomplish a criminal or unlawful purpose by any means, or to accomplish any purpose by criminal or unlawful means. L. Hochheimer, *Criminal Law* § 285 (2d Ed. 1904). Although the gist of the

crime is the combination, it is necessary in either case to submit evidence of the purpose or means of the commission of or attempt at the underlying crime. If we accept the theory of appellant, any evidence in a conspiracy case, whether relating to the combination or to the ultimate criminal object of an accused, would be forever barred from use at a subsequent prosecution for commission of the underlying crime, which case may have been severed at his own insistence. Whatever may be the law in the third circuit or elsewhere, that is not the law of Maryland.

In *Scarlett v. State,* 201 Md. 310, *cert. denied,* 345 U.S. 955 (1953), the defendant who had previously been acquitted of having violated the lottery laws was subsequently convicted on the same evidence of having conspired to violate them. On appeal, Scarlett contended that evidence used in the case for which he had been acquitted should not have been admitted in the subsequent conspiracy case. Relying on the language (not the result) of *Sealfon, supra,* the court said:

> "We cannot agree with appellant that his acquittal of the charges of violating the lottery laws on the three specified days barred the use of evidence obtained on those days to substantiate the charge of conspiracy." *Id.* at 319.

Six months later, in that same term of court, Judge Hammond addressed more explicitly the fact that *res judicata* (the "kissin' cuzzin" of collateral estoppel) does not prevent evidence of acts constituting a crime for which an accused was convicted from use in a subsequent trial for another and separate crime. *Rouse v. State,* 202 Md. 481, *cert. denied,* 346 U.S. 898 (1953), differed somewhat from *Scarlett* and from the case at bar. Rouse had been *convicted* at his first trial of having violated the lottery laws. Thereafter he was convicted in a second trial of having conspired to violate those laws. The Court of Appeals affirmed although the State used much of the same evidence to convict in each case. Significantly in *Rouse* and in the case before us, appellants placed primary reliance upon *Sealfon, supra.*

The accused in *Sealfon* was indicted for conspiracy to defraud the United States and separately for the substantive offense. He was acquitted of conspiracy but convicted in a separate trial for the substantive offense. As explained by Judge Davidson in *Powers, supra* at 277, the Supreme Court in *Sealfon:*

"... recognized that the first jury's verdict of acquittal determined an ultimate fact in favor of the accused while the second jury's verdict of conviction subsequently determined the same ultimate fact against the accused. It concluded that because the first jury's verdict of acquittal was a 'determination favorable to [the accused] of the facts essential to the conviction,' the second jury's subsequent inconsistent verdict of conviction must fall."

In summarizing the teaching of that case, however, Judge Davidson pointed out that *Sealfon:*

"... established not only that inconsistent verdicts, when reached in successive trials, are not permissible, but also that once a person has been acquitted, the federal government cannot prosecute him a second time for a related offense having a *common issue of ultimate fact essential to conviction,* which the previous acquittal had determined in his favor." *Powers, supra* at 277. (Emphasis added).

In analyzing *Sealfon* both Judge Hammond in *Rouse* and Judge Davidson in *Powers,* although writing for different purposes, focused upon and noted that in *Sealfon* the evidentiary proscription did not extend to all that evidence used in the first case to make up the violation of the crime alleged. It was only the "one fact essential to a finding of guilty" which could not be used in the subsequent prosecution of a different crime. *Rouse, supra* at 490.

By blending the key clauses of these dissertations, we condense them to a workable rule that fully supports the anti-harassment function of collateral estoppel. When it

appears substantially certain that a jury has already decided a fact essential to conviction in the accused's favor, (*Powers, supra* at 287) "that particular fact" (*Rouse, supra* at 490) which was "necessarily determined" (*Kramer, supra* at 916) may not be relitigated at a subsequent trial for a separate crime.

In the case at bar, the trial judge was absolutely correct in ruling that Ms. Leak's hearsay testimony of Wiley's conversation relating to appellant was not admissible under the co-conspirator's exception to the hearsay rule. Obviously in light of that determination, she could not qualify as a conspirator. But there was no reason to exclude her testimony of the rape and robbery which would circumstantially show why the victim (Reid) had been killed. A closer question arises, however, in regard to the testimony of Harry Lockwood regarding the murder of the other victim (Addison) in New York. The obvious purpose of this testimony was to show that Addison's murder was part of the same common scheme or plan which also resulted in Reid's murder, as indicated by appellant's comments to Lockwood following the murder of Addison.

By circumstantially connecting Addison's participation in Ms. Leak's rape and robbery with Reid's having planned it (at least in the mind of the employer, Wiley), the testimony that appellant was paid to kill Addison was admissible as a common plan or scheme exception to the bar of evidence relating to other crimes. *Ross v. State,* 276 Md. 664 (1976). The very fact that its admissibility rests upon the common plan or scheme exception, however, makes it appear very close to being the "ultimate fact" decided in the conspiracy cases. It is such suspect circumstance as this that requires one more step upon appellate review.

All of the cases cited by appellant, especially his primary authority, *Ashe v. Swenson, Turner v. Arkansas,* and *Powers v. State,* as well as *Simpson v. Florida,* stand for another principle implicit in both *Rouse* and *Scarlett.* When doubt arises, the determination of whether collateral estoppel applies where the previous acquittal was based upon a

general verdict requires the court to examine carefully the record of the prior proceedings, taking into account the evidence, the instructions, and any other relevant matter in the light of the crime acquitted and that convicted. From this review we must conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration in the case last tried.

Appellant argues most persuasively that from opening statement to closing statement and sprinkled throughout the testimony there are statements and allusions of and to a "contract" killing. He notes that there is a very fine semantic line between a "contract" to kill and an unlawful combination to kill. He urges that when he was found not guilty of having combined unlawfully to commit a crime, that determined nonparticipation in anything therein related, such as a murder for hire, and precluded the re-use of any evidence to show motive or premeditation and deliberation which might be inferable from the money-motive in this case.

We do not see the collateral estoppel cases as going this far. The purpose of the evidence in the conspiracy cases was to prove the ultimate fact of a combination. Whether that combination existed is not essential either to the motive of appellant in killing the victims or to whether he deliberated upon it in advance. Although the two factfinders were permitted to view and hear some of the same factual evidence, the "ultimate fact" which they were to decide was entirely different. The first factfinder did not ever decide, or need to decide, whether appellant killed Reid; nor was there a need to decide that issue as to Addison. It follows that the first factfinder had no reason to concern itself with motive or with premeditation, which were the only related concerns of the second factfinder. The second factfinder, on the other hand, was not concerned with whether there was or was not a conspiracy. Although all conspiracies must presuppose elements of premeditation and deliberation, that which is significant here is that the converse is not true.

Our review of both cases, including the instructions of the courts, provides us with assurance that the ultimate facts decided were not the same "[T]he doctrine's purpose [of] avoid[ing] compelling relitigation of a fact material to the question of innocence: was not intruded upon because it did not appear "substantially certain that a jury ha[d] already decided that fact in the accused's favor." *Powers, supra* at 287.[2]

— double jeopardy —

At the hearing on the motion to dismiss on double jeopardy grounds, appellant sought to avoid the effects of consenting to a mistrial by distinguishing between his motion for severance and a mistrial motion to which he contended he had never assented.

> "MR. CARDIN: The only response that I want to make, Your Honor, is since the docket entries do not indicate any type of mistrial by any party, if they are going — if the Court is now going to state that it meant to declare a mistrial, whatever it may be, I just want the record to show we object to the mistrial, if I hadn't done it then — if it is going to be construed that we consented to it by moving for severance, then the record will speak for itself, but I just want to make it clear that we never consented verbally, affirmatively, to a mistrial."

The fragrance is not affected by what we call the flower. The distinction does not turn upon the label applied by the trial judge. The critical question is whether the order contemplates an end of all prosecution of the defendant for the offense charged. *Lee v. United States,* 432 U.S. 23, 30 (1977). Appellant got what he asked for from start to finish. He not

---

**2.** We should also note that in light of Maryland's constitutional provision making the jury the judge of law as well as of fact, Md. Const., Art. 15, § 5, an acquittal by the jury at the first trial may have rested solely on its unique view of the law concerning that offense, and cannot be taken as having necessarily "determined" any particular question of fact. *Benton v. Maryland,* 395 U.S. 784, 804 (1969) (Harlan, J., dissenting).

only moved for severance, and suggested the State thereafter elect its course (which was in every effect consent to a mistrial of one or both), but also *twice* actually *sought* a mistrial which is, practically speaking, that which he received — a temporary respite rather than a final adjudication. *See Lee v. United States, supra.* As indicated in *Bell v. State,* 286 Md. 193, 201-05 (1979), and repeated in *Jones v. State,* 288 Md. 618, 626 (1980):

> "Retrial is not barred as violative of the Double Jeopardy Clause of the Fifth Amendment when a mistrial is declared at the behest or with the consent of the defendant unless such error or misconduct, sufficient to justify the declaration of a mistrial, was committed by either the prosecutor or the court with the intention of (1) forcing the defendant to move for or consent to a mistrial, or (2) prejudicing his prospects for an acquittal if the trial continued to a verdict. It is 'bad faith conduct by judge or prosecutor' with such intent that prohibits retrials."

We have carefully reviewed the entire record and find not the slightest indication of "bad faith conduct by judge or prosecutor." From the very beginning — even before the trial commenced — appellant elected the course which the court was compelled to pursue. While we did not and do not recommend deferring severance decisions, it was his suggestion that the court do so. He may not now fashion the *Ellerba* shield into a double jeopardy sword since it was he who carefully chose both armor and grounds upon which to do battle. The confusion which resulted, however, should indicate the wisdom of avoiding that procedure after jeopardy has attached — in more ways than one.

— speedy trial —

The same rationale applies to his complaint of denial of a speedy trial. Unquestionably he most carefully guarded himself by asserting his right promptly, repeatedly and dili-

gently through efforts of his attorney. So diligent was counsel that he first filed his motion on April 9, 1979, two weeks before he formally filed his appearance notice on April 26, 1979. Less than a month after his first motion, he filed a second (on May 2, 1979) and by September he was heard on those motions which were denied. In applying the balancing test of *Barker v. Wingo,* 407 U.S. 514, 530 (1972), those two assertions would tilt distinctly in favor of appellant, *see Gillis v. State,* 4 Md. App. 265, 267 (1979), and such motion was filed yet again before his second and final trial on March 11, 1980, which clearly preserved the assertion factor in his favor. Testimony indicated that appellant's attorney did not stop with merely filing motions but sought trial dates from the assignment clerk on several occasions. These efforts were thwarted by the clerk's insistence that the prosecutor must agree upon a date.

However diligent were these repeated efforts, we note that the Supreme Court does not view the assertion factor strictly in a quantitative sense but relates it to the other facts as well.

> "Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Barker v. Wingo, supra* at 531.

The State's reasons for the initial delay seems only to have been attributed to the orderly administration of justice. *See Epps v. State,* 276 Md. 6, 110 (1975). One month of that seven-month time span was peculiarly the fault of appellant due to the unavailability of his counsel, June 19, 1979 to July 11, 1979. Although that which is an orderly administration obviously varies from time to time, surely six months is none too long to prepare and try a complicated dual conspiracy-to-murder and murder case spanning two states. The record further suggests that appellant was also involved

with other criminal charges, and his counsel during that time, was equally involved in court appearances.

But then we add an additional six months, from September 26, 1979 when the murder trial was aborted, to March 11, 1980 when it was finally tried. Again appellant's counsel was unavailable between October 1, 1979 and November 9, 1979. Notwithstanding such unavailability, he filed his third motion to dismiss on speedy trial grounds on October 15, 1979.

But for the burden of cases in Baltimore City, it is hard to understand why this case could not have been set down sooner; however, our review of the record indicates that the State made every reasonable attempt to dispose of it while permitting appellant requisite opportunity to pursue the tactical course he had chosen.[3] Assuming as we must, based on his holding, that the trial judge believed this recitation, we cannot say he was clearly erroneous in doing so.

In regard to prejudice, we have presumed as much throughout as we are compelled to do irrebuttably for purposes of determining constitutional dimension, *Brady v. State,* 288 Md. 61 (1980), and through our analysis under *Barker v. Wingo, supra,* in the absence of rebuttal by the State. *Brady v. State,* 46 Md. App. 518 (on remand) (1980). We have weighed the prejudice we have presumed as enhanced by the continued pretrial incarceration of appellant, but note that such is not dispositive of this case, *Wilson v. State,* 8 Md. App. 299, 307 (1969); nor is any other single factor dispositive, despite the obvious limitations it put upon appellant when all factors are placed upon the scale. *Barker v. Wingo, supra* at 532.

Appellant testified that two witnesses died prior to his first trial, each of whom would have verified that the prosecution witness Lockwood was actually the contractor buying the victim's lives rather than Wiley. Appellant did not say, however, that the witness would have testified that

---

3. So as not unnecessarily to burden this record, we have appended excerpts from the prosecutor's testimony in that regard.

appellant was not the contracting instrument of death — or more importantly — that appellant did not in fact kill the victim Reid.

On balance, then, we cannot find that appellant was denied a speedy trial under the facts of this case. The record reflects a concerned and diligent effort by the State to move forward to conclusion without running roughshod over appellant's rights to defend himself with preliminary procedures (e.g. his various motions to dismiss, etc.).

We are, of course, always concerned when a case is not tried within the period of "constitutional dimension." The problem is that that period varies depending upon the particular circumstances of each case. As a consequence, we must use the same analysis twice — first to determine if the delay exceeded constitutional dimension so that we can then secondly determine if a speedy trial were denied. Frequently, if the time span chargeable to the State does not exceed that which was procedurally orderly under the circumstances of the case, the period will not exceed that referred to as within "constitutional dimension." Since no yardstick has been provided by the Legislature or the Court of Appeals, other than the 180-day period for setting a trial date following the first appearance of defense counsel or defendant himself (Md. Rule 746 a; Md. Ann. Code art. 27, § 591), we are compelled to use that time frame as a general guide for determining orderly procedure. The facts of this case do not reveal any unnecessary detriment to appellant nearly so grave as that which was caused by the five-and-one-half-year delay which occurred in *Barker v. Wingo,* supra.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*

"Q. Mr. Stein, would you please explain to His Honor the delay between the last trial and today?

A. If Your Honor please, after the jury returned its verdicts of not guilty against the Defendant back in September of 1979, I was aware Mr. Cardin was to begin a protracted trial involving the Mudge Paper Company in front of Judge Levin. And the case did indeed go for approximately six weeks.

During that time I never had much opportunity to see Mr. Cardin. However, I distinctly remember a conversation with him about remaining indictments against the Defendant, this indictment. Mr. Cardin categorically told me the Defendant was going to proceed to have the indictment dismissed by way of double jeopardy.

That is what Mr. Cardin told me. When Mr. Cardin told me that, I assumed that when he said the Defendant was going to proceed by way of double jeopardy, that if the Defendant was denied the motion he of course would appeal to the appropriate appellate courts.

As time went on, eventually the Mudge Paper Company case wound down. I again saw Mr. Cardin. He again assured me Mr. Wise was going to proceed by way of double jeopardy.

Mr. Cardin then assured me, if Your Honor please, because Mr. Wise was going to proceed by double jeopardy, he was going to waive extradition here and go to New York for the charges against him up there because there would be no speedy trial issue because he, Mr. Wise, was going to appeal the denial of double jeopardy if it was indeed denied.

That was always my understanding. Eventually, Mr. Cardin and I got together and I suggested to Mr.

Cardin that if he was going to proceed this way, the most expeditious way to proceed would be to have the case set in in Part 3 where the motion for double jeopardy would be raised and, denied, the Defendant would then appeal, which of course is his immediate right to do so and the State cannot bar his appealing it.

Mr. Cardin agreed. It was Mr. Cardin who went down to the Criminal Assignment Office and had the case put in in Part 3 for that very purpose.

Now, if Your Honor please, Mr. Cardin all the while was telling me Mr. Wise was going to waive extradition. The case was set in for Part 3 for the purposes of this double jeopardy motion I believe on September 15th. The date is really not important. I am sorry, Your Honor. December 17th.

When Mr. Cardin assured me that Mr. Wise was going to waive extradition — Before the case was heard on December 17th, I received a letter from the New York Police Department or from Mr. Sullivan — I cannot remember which — which informed me they were coming down to take Wiley up for his charges.

And it was their understanding also Mr. Wise was going to waive extradition and they were going to take him at the same time. Would I please make arrangements to have Mr. Wise available.

I called Mr. Cardin and informed him of this and I said to Mr. Cardin that they are coming down after the hearing. Why don't we set the hearing in a couple of days and if it is denied they can take Wise away. Mr. Cardin agreed.

And I am sure the records of the Criminal Assignment Office will substantiate my claim that after the case was set in by Mr. Cardin in Part 3, it was moved back two or three days in order to accommodate the New York authorities because again, sir, I was always under the impression the Defen-

dant was either going to appeal his denial of double jeopardy and/or he was going to waive his extradition to New York.

Now, December 26th, Your Honor, I received that letter that is now in evidence indicating to Mr. Sullivan that the Defendant, Mr. Wise, is going to waive extradition, wants all of his charges on January 16th, 1980 disposed of, sir.

I knew that this indictment here, sir, was not in for trial on January 16th, 1980, and of course Mr. Cardin's letter to Mr. Sullivan corroborated our conversations all along.

However, on December 27th I was flabbergasted to get another letter from Mr. Cardin to Mr. Sullivan in which Mr. Cardin now informs Mr. Sullivan that his December 26th letter was inaccurate. Now, the Defendant Wise is going to wait for the disposal of this indictment.

When I heard that, I immediately moved and I went to the Criminal Assignment Office in December and had this case set in for January 22 in front of Your Honor for purposes of hearing the motion on double jeopardy and of course, as Your Honor knows, you sent us then to Judge Greenfeld where Judge Greenfeld disposed of it.

I then after Judge Greenfeld's disposition of it, I went to Criminal Assignment on February 1, 1980, and had it set in for trial for March 10, 1980. That is the scenario as I understand it."