752 A.2d 653

**Antoine Markee MITCHELL**

v.

**STATE of Maryland.**

**No. 690, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 1, 2000.

314

Douglas Hudson (Jennifer P. Lyman, Assigned Public Defender, on the brief), Washington, DC, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before MURPHY, C.J., and HOLLANDER and ADKINS, JJ.

HOLLANDER, Judge.

Antoine Markee Mitchell, appellant, was charged with numerous offenses in connection with the assault and shooting of Eddy Arias.[1] Following a jury trial in the Circuit Court for Prince George's County, appellant was convicted of attempted second degree murder, first degree assault, use of a handgun in the commission of a felony, conspiracy to commit second degree murder, and conspiracy to commit first degree assault.

---

1. In the trial transcript and the charging document, the victim's name is spelled "Eddy." In appellant's brief, the name is spelled "Eddie." We shall rely on the spelling in the charging document.

At the close of the State's case, the circuit court granted appellant's motion for judgment of acquittal as to the charges of attempted first degree murder, conspiracy to commit first degree murder, and possession of a firearm by a convicted felon. The jury subsequently acquitted appellant of second degree assault. Thereafter, appellant was sentenced to a total of forty-six years of incarceration.

On appeal, appellant presents six issues for our consideration, which we have condensed and restated as follows:

I. Did the court err in refusing to grant appellant's motion for mistrial after a witness revealed that appellant was incarcerated?

II. Is conspiracy to commit second degree murder a crime under Maryland law and did the court err in allowing the jury to consider that charge?

III. Was the evidence sufficient to support appellant's convictions?

For the reasons that follow, we shall affirm.

## FACTUAL BACKGROUND [2]

Sometime between noon and 1:15 p.m. on September 5, 1997, Eddy Arias was shot from behind by two men wearing stocking masks. The bullet entered the victim's right hip area, just above his buttocks, and exited through the other side. The attack occurred in the interior stairwell of the apartment building at which Mr. Arias resided, located at 8805 Barnsley Court in Laurel.

At trial, Mr. Arias testified that prior to the incident he had gone to the store to get food for his wife. Upon his return, "two guys with a gun went around [his] neck. And they tried to attack [him] with the gun." Mr. Arias stated that he

---

**2.** Ten witnesses testified for the State. Because we must consider the evidence in the light most favorable to the State as the prevailing party, our factual discussion essentially constitutes a summary of the State's case.

"pulled [his attacker's] head up and [the attacker] pushed [him] to the wall."

According to Mr. Arias, the shooter was an African–American male, about six feet one inch tall, who used a "black" gun. The other assailant was an African–American male, whose height was estimated at about five feet eight inches tall. Mr. Arias stated that the shorter man was carrying what appeared to be an "aluminum-colored" .45 caliber gun. The State accused appellant of being the shorter of the two people involved in the attack. The following colloquy on direct examination is relevant:

[PROSECUTOR:] The individual who was the shorter one, what, if anything, was he doing while this was going on?

[MR. ARIAS:] When the tall guy grabbed me by my neck I was trying to fight him. And the other guy was going like (indicating) looking for me.

THE COURT: The other guy what?

[MR. ARIAS]: He was trying to—You know, pointing the gun. You know, looking for me with the gun (indicating).

Mr. Arias explained that he was able to break free and began to run up the stairs of his apartment building, but "the tall one" shot him from approximately five feet away. Mr. Arias managed to ascend the stairs to the next floor, where his apartment was located, and he began to knock on "all the doors." The attackers remained in the building for a short time. After they left, Mr. Arias returned to his apartment.

Michelle Arias, the victim's wife, testified that her husband received three messages on his pager shortly before the shooting. Each time, Mr. Arias left the apartment and returned soon thereafter. The second and third pages read "911." Upon his return from the third page, Ms. Arias stated that she heard a commotion in the hallway outside the apartment, followed by a single gunshot. After Mr. Arias screamed her name, Ms. Arias opened the door to let him in. She then went to the kitchen window and saw two African–American men walking away from the building, wearing blue jeans and nylon stockings pulled down to their eyebrows. Ms. Arias

indicated that one of the men had a light complexion, was approximately five feet eight inches tall, and "had like a darkish, greenish tee-shirt." She described the other man as having a darker complexion, about six feet tall, wearing a dark blue tee-shirt and holding a gun. According to Ms. Arias, the two men got into a red, four-door Nissan Sentra and "sped away quickly."

Although Ms. Arias had a clear view of the men from about 25 feet away, and Mr. Arias had direct contact with them, neither the victim nor his wife was able to identify appellant at trial as one of the two men who had been involved in the shooting. Moreover, Mr. Arias testified that he had never seen either of his attackers prior to the shooting.

At about 1:15 p.m. on the day of the shooting, Prince George's County police officers responded to a call that shots had been fired at 8805 Barnsley Court. When Corporal Dove Robinson entered the Arias's apartment, she saw that Mr. Arias had suffered a gunshot wound to the hip. There was blood on the stairway leading to the victim's apartment and a hole in the wall. A spent shell casing was found on the stairs, but the bullet was never recovered.

Corporal Steven Gaughan testified that he was in his patrol car approximately half a mile away from 8805 Barnsley Court when he heard the police broadcast about the shooting. The dispatcher indicated that a small, red, four-door car occupied by an African–American male wearing a jump suit had been observed leaving the scene. Less than a minute after the broadcast, two African–American men in a vehicle fitting the dispatcher's description passed Gaughan going the opposite direction. One of the men was wearing a blue "top."

Gaughan made a U-turn, activated his emergency lights and siren, and radioed for backup. The suspect vehicle took off at high speed. Although Gaughan gave chase, he lost the vehicle in an apartment complex after it turned onto Morris Drive in Laurel. Gaughan testified that later, when a vehicle matching the description was found and he had a chance to inspect it, he thought it was "exactly like the vehicle [he] had been chasing."

Paul Blair was employed by the company that managed the apartment complex. At about 1:15 p.m., Blair and several other men were moving a safe out of the complex's rental office on Morris Drive when he "heard a loud noise, like tires squealing," and turned to see a red Nissan or Toyota speed past him. The vehicle quickly made a sharp right turn from Morris Drive onto Parkside. As Blair was less than fifteen feet away from the vehicle when it passed, he was able to see that there were two people in the car, both African–American, and he identified the driver as male. Blair also made note of the Maryland tag number. Several minutes later, Blair saw a Prince George's County police car enter the complex and continue straight down Morris Drive without turning onto Parkside.

While Blair and the other men moved the safe to a storage shed, Blair saw the same vehicle parked in front of the apartment building located at 14 Sharon Court. At that time, the car was unoccupied and parked out of alignment with the parking spaces. As Detective William Gross drove into the complex, Blair flagged him down. Blair told Gross "that the car that you may be looking for is sitting on Sharon." He then directed the officer to the vehicle.

When Gross approached, the vehicle was backing out of its parking space. Gross and another officer, Corporal Howard Calvert, positioned themselves behind the vehicle and made a "felony traffic stop."[3] The vehicle was occupied by two African–American women, Patricia Wills and Debra Pitts, who were ordered out of the car. Calvert noted that the vehicle's hood felt hot.

---

**3.** Calvert described a felony traffic stop as follows:

[W]e pull behind the vehicle, get back-up, and we call the occupants of the vehicle out of the vehicle, one at a time. A lot of times we pull our guns. . . . What we'll do is actually call one occupant out at a time. Usually we'll call the driver out. . . . Get out of the vehicle, come back towards us. If they are wearing baggy clothing, or something like that, where we can't get a visual of their waistband, we ask them to put their hands up and turn around, and make sure there is no weapons on their person. And we call them and secure them back towards us.

Gross found two nylon stockings on the rear seat of the vehicle. These same stockings were shown to Ms. Arias at trial, and she said they resembled the ones worn by the assailants. When Calvert conducted a sweep of the area, he found a .45 caliber magazine from a gun containing five bullets on the ground near the door to 14 Sharon Court. The magazine was in plain view and did not show any signs of having been there for very long.

Wills owned the suspect vehicle. She and her friend, Pitts, were on their way to the store when Gross and Calvert ordered them to exit the vehicle. Wills explained that she and Gregory Ellis had driven to 14 Sharon Court to help Pitts move out of her apartment. Wills described Ellis as "about six feet tall. Dark complected. Real slim build." According to Wills, when she and Ellis initially got out of her car, Ellis asked her for the keys so that he could go to the store to buy beer. Wills then gave Ellis the keys and went inside. She testified that she never saw Ellis again.[4] Wills indicated, however, that she did not know appellant.

Pitts testified that, shortly after Wills arrived, she looked out of an apartment window and saw Ellis with appellant. She recalled that appellant was wearing a white polo shirt. Thereafter, Wills, Pitts, and Pitts's sister left to rent a U–Haul moving truck.[5] When they returned with the truck, Wills and Pitts decided to take Wills's car to get food. Their attempt was interrupted by the aforementioned felony traffic stop.

At trial, the State pressed Wills to identify who was at 14 Sharon Court on the day of the shooting. Wills testified that Pitts's boyfriend, "Tony," was supposed to help, but that he never showed up. She claimed that she had never met "Tony" and did not know who he was. Wills did mention, however, that she "knew of a Tony Lyle." Elaborating upon the

---

4. It is not clear from Wills's explanation of events when or how the keys were returned to Wills.

5. Blair testified that a U–Haul moving truck had been parked in front of 14 Sharon Court for several days.

identity of Mr. Lyle, Wills explained: "That is one of [Pitts's] boyfriends. He's locked up at [the] Eastern Shore." After successfully seeking the court's approval to treat Wills as a hostile witness, the following colloquy ensued:

[PROSECUTOR:] Ms. Wills, isn't it true that on the fourth page of [the statement you provided the police on the day of the shooting] you indicate that Tony and Greg [Ellis] know each other through you. Is that correct?

[WILLS:] Yes, I did.

[PROSECUTOR:] So when you testified a few moments ago, before I showed you this statement, that you don't even know who Tony is, that is not true. Isn't that correct?

[WILLS:] I don't know.

[PROSECUTOR:] You had no idea who Tony is?

[WILLS:] No, I don't.

[PROSECUTOR:] How do you know Tony and Greg know each other?

[WILLS:] (No audible response.)

\* \* \*

[PROSECUTOR:] Do you know why you answered that question that way on September 5?

[WILLS:] That was almost two years ago. I have no idea.

Pitts testified that, in addition to her sister and Wills, "a friend of [Pitts's] named Greg and a friend of mine named Tony" were supposed to help Pitts move. Further, Pitts testified that although she did not speak to appellant after the shooting on September 5, 1997, she did speak to him prior to September 10, 1997. The State questioned Pitts about that conversation, as follows:

[PROSECUTOR:] What exactly did you discuss?

[PITTS:] I asked him—It wasn't a discussion. I asked him a question and he did not answer it.

And when I asked him did he know what happened in my cousin's car? Does he know what happened with my cousin's car?

And he said, why?

I said because—I said: "Do you know what happened in my cousin's car?" I said, because the Police trying to charge us, was trying to charge us with something.

And he said: What did they say?

And when I was getting ready to answer he said, Forget it. And he said he would get ready to go to New York.

And that was it. It wasn't anything else.

Further questioning elicited the following:

[PROSECUTOR:] Did he indicate who he was going to New York with?

[PITTS:] With Greg.

[PROSECUTOR:] Greg Ellis? The same person he was with earlier?

[PITTS:] He just said Greg. I can't say if it was Greg Ellis. . . .

Detective Larry Best of the Washington, D.C. police department was the State's final witness. Best was called to describe the physical characteristics of both Ellis and appellant. He testified that Ellis is six feet one inch tall and weighs 175 pounds, while Mitchell is five feet seven inches tall and weighs 160 pounds.

The parties subsequently stipulated that latent fingerprint examination of the suspect vehicle revealed Ellis's fingerprint on the driver's window. Appellant's prints were not recovered, however.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

■ Appellant complains that the court erred in refusing to grant his motion for mistrial, which was generated in response to the State's direct examination of Pitts. After eliciting testimony that Pitts had seen "Tony" outside her apartment on the day of the shooting, the following exchange occurred:

[PROSECUTOR:] And the Tony we are talking about outside is the gentleman sitting here in the white shirt without a jacket on. Is that the Tony we are talking about?

[PITTS:] Yes.

[PROSECUTOR:] This was the Tony that you were talking about who was out helping you?

[PITTS:] Well, he hadn't begin [sic] to help me.

[PROSECUTOR:] I'm sorry?

[PITTS:] He hadn't begin [sic] to help me. We hadn't gone to get the U–Haul yet.

[PROSECUTOR:] Okay. But this Tony—Antoine Markee Mitchell—this is the person that you are talking about here? This is the Tony we are talking about? This is the Tony we are talking about?

[PITTS:] I knowed [sic] him as Tony at the time.

[PROSECUTOR:] I understand that ma'am. The person you describe as Tony, is that the person who is seated here today?

[PITTS:] Yes.

\* \* \*

[PROSECUTOR:] Now, this Tony was there to help you. Where was Greg when Tony was there?

[PITTS:] He was—I mean I just seen him for a split second. And I don't know where he went. I don't know. I didn't see them any more.

\* \* \*

[PROSECUTOR:] Okay. And you—this man here, the Defendant, Mr. Mitchell—from the time of September 5 of 1997 you hadn't seen him for about a year after that?

[PITTS:] Yeah. Maybe it was a year. I think it was maybe going on two years. It probably was. Because I didn't see him again until I ran into a friend of his, and *he told me that he* [, i.e., appellant,] *was locked up.* And that is when I moved.

[APPELLANT'S COUNSEL]: Your Honor, objection.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: May we approach, Your Honor?

(Emphasis added.)

At the bench, the following discussion ensued:

[APPELLANT'S COUNSEL]: Your Honor, I am going to have to move for a mistrial. It's obvious that the jury has heard that this Defendant was locked up. And the fact that he was locked up, I believe, you know, has so prejudicially tainted the jury that I don't think that my client could get a fair trial now.

I'm not suggesting that the State's Attorney knew she was about to say that, but the fact that she did.

THE COURT: Well, do you want to excuse the jury while we argue this?

[PROSECUTOR]: (Nodded affirmatively.)

The jury returned to the jury room at 3:52 p.m. Thereafter, appellant's counsel argued:

Your Honor, I'll be moving for a mistrial. I believe this matter, now that the jury has heard that Mr. Mitchell was locked up, we believe that the jury is now so prejudicially torn that they will be unable to decide the facts of this case based on the other evidence, or any other evidence that may come in before their consideration.

Obviously the Court is well aware that we take great pains to keep such matters from the jury for that very reason. It is not relevant. But now that they've heard that he's locked up, I think that it is just impossible for him to get a fair trial from this point on.

The State contended that a curative instruction would be sufficient to remove any taint caused by Pitts's testimony. Appellant disagreed. The court ultimately took a recess to consider how best to proceed.

At 4:15 p.m., the court returned to the bench and informed counsel that it "was going to deny the mistrial and give the

curative instruction." The court's decision prompted further discussion, which ended with the court's decision to provide the following curative instruction:

> You have heard testimony that the Defendant was incarcerated. This is because he was not able to make his bond.
>
> The fact that he was not able to make bond has no bearing on whether he is guilty or not guilty of these charges. It is not a matter that can be considered by you. It is not a matter to be discussed by you.

The instruction was delivered at 4:55 p.m., slightly over one hour from the time of Pitts's testimony.

Appellant contends that Pitts's testimony was particularly damaging because Pitts was "the State's pivotal witness linking [appellant] to the case." With this in mind, he argues that Pitts's statement that he was "locked up" effectively deprived him of a fair trial. Appellant further avers that the court's curative instruction, coupled with the delay in giving that instruction, "speak to the inability" of the court to cure the harm. The State counters that the trial court's remedial efforts were sufficient to dissipate any harm.

■ "The grant of a mistrial is considered an extraordinary remedy and should be granted only 'if necessary to serve the ends of justice.'" *Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999) (citation omitted); *see Braxton v. State,* 123 Md.App. 599, 666–67, 720 A.2d 27 (1998); *Burks v. State,* 96 Md.App. 173, 187, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993). The necessity of a mistrial turns on the extent of the prejudice to the defendant. *See Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992); *Braxton,* 123 Md.App. at 667, 720 A.2d 27; *Burks,* 96 Md.App. at 189, 624 A.2d 1257. The question, then, is whether "the damage in the form of prejudice to the defendant transcended" the effect of a curative instruction and deprived appellant of a fair trial. *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989); *see Rainville,* 328 Md. at 408, 614 A.2d 949.

Whether to grant a mistrial is a matter "classically ... entrusted to the wide discretion of the trial judge." *Burks*, 96 Md.App. at 190, 624 A.2d 1257. This is because the trial judge is "in the best position to assess the relative impact" of the damaging testimony, and whether a "curative instruction should suffice," based on the judge's "superior coign of vantage." *Burks*, 96 Md.App. at 189, 624 A.2d 1257. When we are asked to review a circuit court's denial of a motion for mistrial, we must determine whether the trial court abused its discretion. *See Klauenberg*, 355 Md. at 555, 735 A.2d 1061; *Hill v. State*, 355 Md. 206, 221, 734 A.2d 199 (1999); *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). We will only reverse the denial of the motion for mistrial if "the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Hunt*, 321 Md. at 422, 583 A.2d 218; *see Klauenberg*, 355 Md. at 555, 735 A.2d 1061; *Braxton*, 123 Md.App. at 667, 720 A.2d 27.

*Rainville v. State*, 328 Md. 398, 614 A.2d 949, is instructive. There, Robert Rainville was charged with various offenses stemming from the alleged rape and sexual abuse of a seven-year-old girl. At the time of the incident, Rainville was renting a room in the home of the girl's mother and the mother's fiancé. The girl and her brother had gone into Rainville's room to watch television. At some point thereafter Rainville sexually molested and raped the girl. Just prior to the report of the girl's abuse, Rainville was arrested on child abuse, sexual offense, and battery charges concerning the girl's brother.

Although the State sought to consolidate the trials on the criminal charges relating to the girl and her brother, the circuit court denied the motion. At the trial on the charges relating to the girl, the following question and response occurred:

PROSECUTOR: Now, if you would, describe for the gentlemen of the jury [your daughter's] demeanor when she told you about the incident?

THE MOTHER: She was very upset. I had noticed for several days a difference in her actions. She came to me and she said where [the defendant] was in jail for what he had done to [my son] that she was not afraid to tell me what happened.

*Id.* at 401, 614 A.2d 949.

The defense immediately moved for a mistrial, arguing that Rainville's case had been "hopelessly prejudiced." *Id.* at 401–02, 614 A.2d 949. The court denied the motion, but immediately gave the following curative instruction to the jury:

Gentlemen of the jury, the witness just alluded to some other incident that has nothing to do with this case, and you should not in any way consider what she has said, and you should put it out of your mind and forget about it. Does anybody have any questions about that? Okay. Let's go.

*Id.* at 402, 614 A.2d 949.

On appeal, Rainville challenged the court's denial of the motion for mistrial. The Court found the mother's remark "particularly prejudicial because the defendant had not been convicted of any sexual offenses against [the son], but was being held in jail pending trial on those charges." *Id.* at 407, 614 A.2d 949. In reaching its conclusion, the Court considered several factors previously set forth in its decision in *Guesfeird v. State*, 300 Md. 653, 659, 480 A.2d 800 (1984). The factors included

"whether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists . . . ."

*Rainville*, 328 Md. at 408, 614 A.2d 949 (alterations in original) (quoting *Guesfeird*, 300 Md. at 659, 480 A.2d 800); *see Braxton*, 123 Md.App. at 667–68, 720 A.2d 27. The *Rainville* Court made clear, however, that these factors are not exclusive and

do not comprise the "test" to be used in determining whether a mistrial is warranted. *Rainville,* 328 Md. at 408, 614 A.2d 949; *see Kosmas,* 316 Md. at 594, 560 A.2d 1137; *Braxton,* 123 Md.App. at 668, 720 A.2d 27.

The Court noted that the case against Rainville "rested almost entirely upon the testimony of a seven-year-old girl." *Rainville,* 328 Md. at 409, 614 A.2d 949. It further noted the lack of physical evidence of abuse or rape, inconsistencies in the testimony of several of the witnesses, prior statements made by several witnesses that were inconsistent with the testimony presented at trial, and evidence of antagonism between Rainville and the mother. *Id.* at 409–10, 614 A.2d 949. In light of the circumstances, the Court commented that the mother's remark "may well have meant the difference between acquittal and conviction" and concluded: "It is highly probable that the inadmissible evidence in this case had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could salvage a fair trial for the defendant." *Id.* at 410, 411, 614 A.2d 949.

We are not presented with a situation nearly as compelling as that in *Rainville.* There, a jury was faced with an emotionally charged case involving the sexual abuse of two children. The mother's testimony indicated that the defendant had engaged in the same or similar criminal activity with her son, likely invoking the inference in the jury's mind that Rainville was a serial child abuser. Rainville had sought to avoid the possibility of such testimony by opposing the consolidation of his trials. In contrast, we are confident that the court's curative instruction adequately ameliorated any prejudice that appellant may have suffered. *See Kosmas,* 316 Md. at 594, 560 A.2d 1137.

Pitts's credibility was called into question by the State before and after her remark that appellant was "locked up." In fact, the line of questioning that led to the remark appears to have been intended to establish a relationship between appellant and Pitts and, accordingly, bias on the part of Pitts. We are not persuaded that any significant damage resulted

from Pitts's remark, as it was a single, isolated statement that was wholly unresponsive to the State's question, and the court's curative instruction was adequate to overcome any taint.

In sum, we cannot say that the trial judge abused her discretion in concluding that the extraordinary remedy of mistrial was not warranted under the circumstances. As we stated in *Brooks v. State*, 68 Md.App. 604, 613, 515 A.2d 225 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987), "[w]hile a defendant is entitled to a fair trial, he is not entitled to a perfect one; and when curative instructions are given, it is presumed that the jury can and will follow them." *See Brooks v. State*, 85 Md.App. 355, 360, 584 A.2d 82 (1991).

## II.

On appeal, Mitchell asserts for the first time that conspiracy to commit second degree murder is not a crime, and therefore his conviction for that offense must be reversed. The indictment charged, *inter alia*, conspiracy to commit second degree murder, alleging that appellant "did conspire with Gregory Ellis, to feloniously with malice aforethought, kill and murder Eddy Arias in violation of the Common Law of Maryland." At trial, appellant did not challenge the legal adequacy of that count; he did not move to dismiss it on the ground that it charged a nonexistent crime, nor did he move for judgment of acquittal on that basis. At the conclusion of the State's case, Mitchell's only argument as to the charge of conspiracy to commit second degree murder was that the evidence was insufficient to support the charge. Thereafter, at sentencing, appellant requested only that he be sentenced to the "bottom of the guidelines" with respect to the conviction for conspiracy to commit second degree murder, and that his conviction for conspiracy to commit first degree assault merged with that offense.

Preliminarily, the State argues that the issue has not been preserved for our review. Although it is generally true that we will not decide an issue that was not raised in or

decided by the trial court, a party may, on appeal, challenge the trial court's subject matter jurisdiction, independent of whether the issue was raised in or decided by the court. Md. Rule 8–131(a). As the Court of Appeals explained in *Lane v. State,* 348 Md. 272, 703 A.2d 180 (1997):

> This exception to the general rule of preservation is based on the premise that a judgment entered on a matter over which the court had no subject matter jurisdiction is a nullity and, when the jurisdictional deficiency comes to light in either an appeal or a collateral attack on the judgment, ought to be declared so.
>
> In this regard, it has now become recognized that a court may not validly enter a conviction on a charge that does not constitute a crime and that the deficiency in any such judgment is jurisdictional in nature.

*Id.* at 278, 703 A.2d 180 (citations omitted).

The *Lane* Court derived support for its reasoning, in part, from its prior decision in *Williams v. State,* 302 Md. 787, 490 A.2d 1277 (1985). There, the Court stated that a trial "court is without power to render a verdict or impose a sentence under a charging document which does not charge an offense within its jurisdiction prescribed by common law or by statute." *Id.* at 791, 490 A.2d 1277. The Court continued: "Manifestly, where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense." *Id.* at 792, 490 A.2d 1277; *accord Robinson v. State,* 353 Md. 683, 702, 728 A.2d 698 (1999); *Lane,* 348 Md. at 278, 703 A.2d 180; *Townes v. State,* 314 Md. 71, 74, 548 A.2d 832 (1988); *cf.* Md. Rule 4–252 (stating in paragraph (a)(2) that generally a motion alleging a "defect" in the charging document not filed within a designated period is deemed waived, but providing in paragraph (d) that "[a] motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time").

The premise of Mitchell's appellate argument is that the circuit court lacked subject matter jurisdiction with respect to the charge, because any conspiracy to commit murder is necessarily a conspiracy to commit *first degree* murder, and the court acquitted him of that charge. Thus, appellant contends that when he was convicted of conspiracy to commit *second degree* murder, he was convicted of an illusory offense. Because appellant's argument is based on the "jurisdictional sufficiency" of the count alleging conspiracy to commit second degree murder, it may be raised on appeal, notwithstanding his failure to raise the issue below. *Lane,* 348 Md. at 279, 703 A.2d 180. We turn to consider the merits of appellant's contention.

■■■ Murder remains a common law crime in Maryland. *See Whittlesey v. State,* 326 Md. 502, 520, 606 A.2d 225, *cert. denied,* 506 U.S. 894, 113 S.Ct. 269, 121 L.Ed.2d 198 (1992); *Campbell v. State,* 293 Md. 438, 441, 444 A.2d 1034 (1982); *Selby v. State,* 76 Md.App. 201, 209, 544 A.2d 14 (1988), *aff'd,* 319 Md. 174, 571 A.2d 1236 (1990). Common law "murder" is defined as "a killing with 'malice aforethought.'" *Wood v. State,* 191 Md. 658, 666, 62 A.2d 576 (1948) (quoting 4 William Blackstone, *Commentaries* 197); *see id.* (quoting further from Blackstone, and stating that "[m]alice could be express or implied from conduct as where 'one intends to do another felony, and undesignedly kills a man, this is also murder'").

■■■ The term "malice" includes the presence of the required malevolent state of mind as well as the absence of justification, excuse, or mitigating circumstances. *Ross v. State,* 308 Md. 337, 340 n. 1, 519 A.2d 735 (1987); *see Dishman v. State,* 352 Md. 279, 291, 721 A.2d 699 (1998); *Richmond v. State,* 330 Md. 223, 231, 623 A.2d 630 (1993). There are four mental states that qualify as "malevolent," and are consequently associated with four kinds of murder: (1) intent-to-kill murder; (2) intent to commit grievous harm murder; (3) felony murder; and (4) depraved heart murder. *Abernathy v. State,* 109 Md.App. 364, 371–72, 675 A.2d 115 (1996); *Glenn v. State,* 68 Md.App. 379, 384–85, 511 A.2d 1110, *cert. denied,* 307

Md. 599, 516 A.2d 569 (1986); *see Trimble v. State*, 321 Md.
248, 256, 582 A.2d 794 (1990). In *Abernathy*, 109 Md.App. at
371, 675 A.2d 115, however, we said: "The fact that any of
four separate mental states may constitute the *mens rea* of
the crime of murder does not thereby fragment it into four
separate crimes."

A homicide that satisfies the common law definition of
murder is then categorized by statute as either murder in the
first or second degree. *See Whittlesey*, 326 Md. at 520, 606
A.2d 225; *Campbell*, 293 Md. at 441, 444 A.2d 1034. Never-
theless, murder is a single offense. *See Ross*, 308 Md. at 346,
519 A.2d 735. Accordingly, the designation of murder as first
or second degree does "not create new crimes but rather
divide[s] the common law crime of murder into degrees for the
purpose of punishment." *Whittlesey*, 326 Md. at 520, 606 A.2d
225; *see Robinson*, 353 Md. at 708, 728 A.2d 698; *Hardy v.
State*, 301 Md. 124, 137–38, 482 A.2d 474 (1984); *Jeffries v.
State*, 113 Md.App. 322, 334–35, 688 A.2d 16 ("Even so basic a
division of murder as that which split it into two degrees for
punishment purposes did not turn murder into two separate
crimes. The crime, regardless of degree remained simply
murder." (citation omitted)), *cert. denied*, 345 Md. 457, 693
A.2d 355 (1997).

Murder in the second degree is defined in Md.Code (1957,
1996 Repl.Vol., 1999 Supp.), Art. 27, § 411 ("Md.Code, Art.
27") as those kinds of murder not enumerated in Md.Code,
Art. 27, §§ 407 through 410. The aggravating factors that
raise a common law/second degree murder to murder in the
first degree have been codified in Md.Code, Art. 27, §§ 407
through 410. Sections 408 through 410 provide that a killing
committed during the perpetration, or attempted perpetration,
of certain felonies qualifies as first degree murder. Murder in
the first degree also includes a killing "perpetrated by means
of poison, or lying in wait" under section 407. In addition,
that section includes a "wilful, deliberate and premeditated
killing" as first degree murder.

Although a common law intent-to-kill murder is initially regarded as a second degree murder, the presence of wilfulness, deliberation, and premeditation elevates the offense to murder in the first degree. The Court of Appeals explained in *Tichnell v. State*, 287 Md. 695, 717–18, 415 A.2d 830 (1980):

For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time.

*Accord Willey v. State*, 328 Md. 126, 133, 613 A.2d 956 (1992); *see State v. Raines*, 326 Md. 582, 590, 606 A.2d 265 ("However short the period between the intention and the act, if the killing results from a choice made as the consequence of thought, the crime is characterized as deliberate and premeditated murder."), *cert. denied*, 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992); *Hagez v. State*, 110 Md.App. 194, 205–06, 676 A.2d 992 (1996).

In this case, the indictment read, in relevant part:

[T]hat **ANTOINE MARKEE MITCHELL** late of Prince George's County, aforesaid, on or about the 5th day of September, nineteen hundred and ninety-seven, at Prince George's County, aforesaid, did conspire with Gregory Ellis, to feloniously, wilfully and of deliberately premedicated [sic] malice aforethought, kill and murder Eddy Arias, in violation of the **Common Law** of Maryland, and against the peace, government and dignity of the State. **(Conspire to commit murder)**

The parties and the court considered this count as one charging conspiracy to commit *first degree* murder. As we noted, the court granted appellant's motion for judgment of acquittal on that count at the close of the State's case. What is before us is the successive, and disputed, count:

[T]hat **ANTOINE MARKEE MITCHELL** late of Prince George's County, aforesaid, on or about the 5th day of September, nineteen hundred and ninety-seven, at Prince George's County, aforesaid, did conspire with Gregory Ellis, to feloniously with malice aforethought, kill and murder Eddy Arias in violation of the **Common Law** of Maryland, and against the peace, government and dignity of the State. **(Conspire to commit second degree murder)**

Juxtaposition of the two counts reveals that the only substantive difference between them is the addition in the first count of the words "wilfully and of deliberately premedicated [sic]" before "malice aforethought," and the insertion of the words "second degree" into the conclusory parenthetical in the second count.

The jury was instructed on the conspiracy and attempted second degree murder charges as follows:

The Defendant is charged with the crime of conspiracy to commit murder in the second degree and conspiracy to commit assault in the first degree. Conspiracy is an agreement between two or more persons to commit a crime.

In order to convict the Defendant of conspiracy the State must prove that the Defendant entered into an agreement with at least one other person to commit the crime of murder in the second degree or assault in the first degree, and that the Defendant entered into the agreement with the intent that murder in the second degree or assault in the first degree be committed.

The Defendant is charged with the crime of attempted second degree murder. Attempt is a substantial step beyond mere preparation towards the commission of a crime. Attempted second degree murder is a substantial step beyond mere preparation towards the commission of murder in the second degree.

In order to convict the Defendant of attempted murder in the second degree the State must prove that the Defendant took a substantial step beyond mere preparation towards the commission of murder in the second degree. That the

Defendant had the apparent ability at that time to commit the crime of murder in the second degree. *And that the Defendant actually intended to kill Eddy Arias.*

(Emphasis added).

Whether conspiracy to commit second degree murder is a legally viable offense appears to us to be a matter of first impression in Maryland. By analogy, our consideration of the offense of attempted second degree murder in *Abernathy v. State,* 109 Md.App. 364, 675 A.2d 115, is instructive. There, Vincent Abernathy was convicted, *inter alia,* of attempted second degree murder after he indiscriminately discharged a handgun into a group of people, injuring an innocent pedestrian.

On appeal, the defendant argued that he had been wrongfully convicted of a nonexistent crime. This Court affirmed the vitality of the offense of attempted second degree murder, but rejected the contention that a depraved heart state of mind was sufficient to support a conviction for that offense. *Id.* at 371, 675 A.2d 115. Writing for the Court, Judge Moylan reasoned:

Although the *mens rea* of consummated criminal homicide (murder and manslaughter alike) has been multiplied by four, that is not the case with the *mens rea* of inchoate criminal homicide (attempted murder in either degree, attempted voluntary manslaughter, assault with intent to murder). *The exclusive and indispensable* mens rea *of any of the inchoate criminal homicides is the specific intent to kill.* In terms of its *mens rea,* the inchoate crime is far more austerely restricted than is the consummated crime.

*Id.* at 373, 675 A.2d 115 (emphasis added); *see Bruce v. State,* 317 Md. 642, 646, 566 A.2d 103 (1989) ("Because a conviction for felony murder requires no specific intent to kill, it follows that because a criminal attempt is a specific intent crime, attempted felony murder is not a crime in Maryland."); *Earp v. State,* 76 Md.App. 433, 440, 545 A.2d 698 (1988) ("[A] conviction for attempted second degree murder may only be sustained if the perpetrator is found to have harbored the

intent to kill his victim."), *aff'd*, 319 Md. 156, 164, 571 A.2d 1227 (1990) ("[W]here an attempted murder is charged, the State must show a specific intent to kill—an intent to commit grievous bodily harm will not suffice."); *Glenn*, 68 Md.App. at 397–98, 511 A.2d 1110 (concluding that assault with intent to murder requires a specific intent to kill). *See generally Lane*, 348 Md. at 284, 703 A.2d 180 (discussing specific intent element of attempt). We now turn to review the tenets underlying conspiracy.

Conspiracy, like attempt, is both an inchoate and specific intent crime. *See Acquah v. State*, 113 Md.App. 29, 56, 686 A.2d 690 (1996) (discussing specific intent element of conspiracy); *Regle v. State*, 9 Md.App. 346, 351, 264 A.2d 119 (1970) (same). Criminal conspiracy is defined as "the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Townes*, 314 Md. at 75, 548 A.2d 832; *see Campbell v. State*, 325 Md. 488, 495–96, 601 A.2d 667 (1992); *Apostoledes v. State*, 323 Md. 456, 461–62, 593 A.2d 1117 (1991); *Mason v. State*, 302 Md. 434, 444, 488 A.2d 955 (1985); *Cooper v. State*, 128 Md.App. 257, 267, 737 A.2d 613 (1999); *In re Nahif A.*, 123 Md.App. 193, 208–09, 717 A.2d 393 (1998); *Heckstall v. State*, 120 Md.App. 621, 625, 707 A.2d 953 (1998); *see also* Md.Code, Art. 27, § 539 (governing criminal conspiracy). Conspiracy constitutes a separate and distinct offense from the substantive offense that is the object of the conspiracy. *See, e.g., Townes*, 314 Md. at 75, 548 A.2d 832; *Rouse v. State*, 202 Md. 481, 484–85, 97 A.2d 285, *cert. denied*, 346 U.S. 865, 74 S.Ct. 104, 98 L.Ed. 376 (1953); *Beatty v. State*, 56 Md.App. 627, 637, 468 A.2d 663 (1983), *cert. denied*, 299 Md. 425, 474 A.2d 218, *cert. denied*, 469 U.S. 851, 105 S.Ct. 170, 83 L.Ed.2d 105 (1984). Nevertheless, the punishment imposed for a conspiracy conviction cannot "exceed the maximum punishment provided for the offense he or she conspired to commit." Md.Code, Art. 27, § 38.

It is important to underscore that the crux of a conspiracy is an unlawful agreement. *Townes*, 314 Md. at 75,

548 A.2d 832; *Mason,* 302 Md. at 444, 488 A.2d 955; *Heckstall,* 120 Md.App. at 625, 707 A.2d 953. In Maryland, "[t]he agreement is the crime, and the crime is complete without any overt act." *Mason,* 302 Md. at 444, 488 A.2d 955; *see Apostoledes,* 323 Md. at 462, 593 A.2d 1117. To be sure, there is no requirement that the agreement be formal or spoken, but " 'a meeting of the minds reflecting a unity of purpose and design' " is required. *Nahif A.,* 123 Md.App. at 209, 717 A.2d 393 (quoting *Monoker v. State,* 321 Md. 214, 221, 582 A.2d 525 (1990)); *see Townes,* 314 Md. at 75, 548 A.2d 832; *Cooper,* 128 Md.App. at 267, 737 A.2d 613 (stating that "a conspiracy can be inferred from the actions of the accused").

▮▮▮▮▮▮ In order to convict a defendant of conspiracy to commit murder, the State must establish (1) that the defendant entered into an agreement to commit murder (the "agreement element") and (2) that he or she did so with the specific intent to commit the murder (the "intent element"). *See generally Maryland Criminal Pattern Jury Instructions* MPJI–Cr 4:08, at 167 (1986 & Supp.1999) ("MPJI–Cr"). In connection with the intent element, appellant urges that, without regard to the particular degree of murder, proof of a conspiracy to commit murder requires a showing that the conspirators had the specific intent to kill. We agree.

▮▮▮▮ Our decision in *Abernathy,* 109 Md.App. at 372, 675 A.2d 115, made clear that of the four kinds of common law murder, i.e., intent-to-kill, intent to commit grievous harm, felony, and depraved heart, only intent-to-kill murder is an intended murder. The others are unintended murders. *Id.* at 373, 675 A.2d 115. "Intended murder, by definition, comprehends, *inter alia,* an intended killing, to wit, an intent to kill." *Glenn,* 68 Md.App. at 387–88, 511 A.2d 1110. Accordingly, when a defendant conspires to commit murder, he or she intends to kill. Stated differently, the specific intent to kill is the only *mens rea* sufficient to support a conviction for conspiracy to commit murder. It contravenes logic to suggest that a defendant charged with conspiracy to commit murder conspired to commit an unintended murder.

Appellant also argues that if the State proves the intent and agreement elements of a conspiracy to commit murder charge, then it has necessarily established that the defendant intended a "wilful, deliberate and premeditated killing," thereby rendering any charge of conspiracy to commit murder as a conspiracy to commit first degree murder. Md.Code, Art. 27, § 407. Mitchell's argument is appealing on the surface. As we discussed above, a specific intent to kill is a prerequisite to a conviction for conspiracy to commit murder. It follows that if the intent to kill is established, it was wilful. *See Willey*, 328 Md. at 133, 613 A.2d 956; *Tichnell*, 287 Md. at 717–18, 415 A.2d 830. What is less clear is whether satisfaction of the "dual" conspiracy elements necessarily evidences deliberation and premeditation. Appellant argues that it does, referring us to our opinion in *Bell v. State*, 48 Md.App. 669, 429 A.2d 300 (*"Bell III"*), *cert. denied*, 291 Md. 771 (1981),[6] as well as several decisions in other jurisdictions that have adopted reasoning analogous to his own. *See People v. Cortez*, 18 Cal.4th 1223, 77 Cal.Rptr.2d 733, 960 P.2d 537 (1998); *People v. Hammond*, 187 Mich.App. 105, 466 N.W.2d 335 (1991). Notwithstanding the initial allure of Mitchell's argument, we believe that he has relied on an incorrect assumption that is fatal to his success. We explain.

*Bell III* involved an alleged "contract killing." Marie Lanier Bell reached an agreement with Ralph Dulaney Mason, Jr. whereby Mason would kill Bell's husband in exchange for $5,000 and an automobile. *Bell II*, 286 Md. at 194 n. 2, 406 A.2d 909. Sometime thereafter, Mason hid in a closet in the husband's residence; when the husband came home, Mason shot and killed him. *See id.* Bell was subsequently convicted

---

**6.** *Bell v. State*, 41 Md.App. 89, 395 A.2d 1200 (1979) (*"Bell I"*), was affirmed by the Court of Appeals in *Bell v. State*, 286 Md. 193, 406 A.2d 909 (1979) (*"Bell II"*). *Bell I* and *Bell II* involved the defendant's appeal from an unsuccessful motion to bar retrial on the ground of double jeopardy. This Court and the Court of Appeals both held that retrial was not precluded. *See Bell II*, 286 Md. at 204–05, 406 A.2d 909; *Bell I*, 41 Md.App. at 101–02, 395 A.2d 1200. Following her retrial and convictions, the defendant noted the appeal at issue in *Bell III*.

of conspiracy to batter and conspiracy to murder. *Bell III*, 48 Md.App. at 671, 429 A.2d 300.

The trial judge in *Bell III* concluded that Bell conspired to commit first degree murder and sentenced her to life in prison, which is permitted for a conviction of first degree murder. Bell challenged her sentence on appeal. We found no error, stating:

> Because the issue of premeditation was not submitted to the jury, appellant contends that such an inference is not available to the sentencing judge, despite the evidence that the murder was done by "lying in wait." [Md.Code, Art. 27] § 407. She contends that the instructions about that issue became the law of the case despite the evidence before the court. *Cf. Quaglione v. State*, 15 Md.App. 571, 578–80, 292 A.2d 785 (1972). *If one conspires to murder, however, the conspiracy itself is the premeditating factor raising the underlying crime from a second to a first degree offense. See, Wise v. State*, 47 Md.App. 656, 425 A.2d 652[, *cert. denied*, 290 Md. 724, *cert. denied*, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981)]; [*State v. Williamson*], 282 Md. 100, 101, 382 A.2d 588 (1978).

*Bell III*, 48 Md.App. at 680, 429 A.2d 300 (emphasis added) (parallel citations omitted).

Relying on the statement in *Bell III* italicized above, 48 Md.App. at 680, 429 A.2d 300, appellant contends that we found "premeditation to be inherent in the conspiracy to murder." He further suggests that "from this Court's holding in *Bell* [*III*], it follows that conspiracy to commit second degree murder is a nonexistent offense."

Our statement in *Bell III* was accurate *within the factual context of that case*. Bell and Mason agreed that Mason would kill Bell's husband, in exchange for a sum certain of money and an automobile. Mason then killed Bell's husband. Thus, the dual elements of conspiracy were clearly established. Moreover, there was little doubt that the conspiracy was to commit a wilful, deliberate, and premeditated killing, as the agreement was clearly reached in advance of the killing.

The same reasoning is equally applicable to the contract killings involved in *Wise* and *Williamson,* offered as supporting authority in *Bell III.*

In *Wise,* 47 Md.App. 656, 425 A.2d 652, the defendant, who was the hired killer, was acquitted of conspiracy to commit murder. In a subsequent prosecution, however, a jury convicted the defendant of first degree murder. On appeal from the second trial, the defendant challenged the murder conviction alleging, *inter alia,* collateral estoppel. The defendant argued that the State could not admit evidence of the conspiracy in light of the prior acquittal. *Id.* at 662, 425 A.2d 652. We rejected that argument, stating:

> [T]he first factfinder had no reason to concern itself with motive or with premeditation, which were the only related concerns of the second factfinder. The second factfinder, on the other hand, was not concerned with whether there was or was not a conspiracy. Although all conspiracies must presuppose elements of premeditation and deliberation, that which is significant here is that the converse is not true.

*Wise,* 47 Md.App. at 670, 425 A.2d 652.

In *Williamson,* 282 Md. 100, 382 A.2d 588, the defendant "employed" someone to kill her husband. After the husband's death, a jury convicted the defendant of first degree murder, conspiracy to murder, and solicitation of murder. *Id.* at 101, 382 A.2d 588. This Court reversed the murder conviction because the State failed "to prove that the appellant herself committed the murder or was either actually or constructively present when the crime was committed." *Williamson v. State,* 36 Md.App. 405, 407, 374 A.2d 909 (1977), *rev'd,* 282 Md. 100, 382 A.2d 588 (1978). The Court of Appeals affirmed the validity of the conviction, however, determining that "a person indicted for murder in the form prescribed by [Md.Code, Art. 27, § 616] may be convicted of murder in the first degree if the accused was only an accessory before the fact." *Williamson,* 282 Md. at 101, 382 A.2d 588.

Therefore, we are not persuaded that *Bell III* compels the proposition proffered by appellant. Our position garners sup-

port from the opinion of the Court of Appeals in *Gary v. State,* 341 Md. 513, 671 A.2d 495 (1996).

In that case, Morris Gary was alleged to have been one of several participants in a drive-by shooting that left two people dead and several more injured. The shooting was a gang-related attack intended to avenge a previous killing. Immediately prior to the shooting, a "scout" was sent to ensure that members of the rival gang would be on the street. Thereafter, several men in a van, evidently including Gary, opened fire on supposed members of the rival gang. Gary was charged, *inter alia*, with two counts of murder and conspiracy to commit first degree murder. Although the jury deadlocked on the murder charges, it convicted Gary of conspiracy to commit first degree murder. He was subsequently sentenced to life imprisonment. On appeal, Gary challenged the legality of the sentence. In responding to this claim, the Court of Appeals explained:

The relevant statutory provision is [Md.Code, Art. 27], § 38, which provides:

"The punishment of every person convicted of the crime of conspiracy shall not exceed the maximum punishment provided for the offense he or she conspired to commit."

There can be no dispute that the statute, by its plain language, limits the maximum penalty for conspiracy to the maximum penalty for the substantive crime that was the object of the conspiracy. Hence, any sentence *up to and including* the maximum penalty for the substantive crime is permissible.

In the instant case, Gary was charged with and convicted of conspiracy to commit first degree murder. The penalty for first degree murder in Maryland is set out in [Md.Code, Art. 27], § 412(b), which provides in pertinent part:

"[A] person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole."

Thus, a sentence of life imprisonment for conspiracy to commit first degree murder is the lowest of the statutory

penalties for first degree murder. Therefore, Gary's sentence does not violate the maximum penalty for conspiracy to murder set out in [Md.Code, Art. 27], § 38, and is not illegal.

*Gary*, 341 Md. at 517–18, 671 A.2d 495 (citations omitted) (footnotes omitted).

A footnote that follows the phrase "Gary was charged with and convicted of conspiracy to commit first degree murder" is relevant here:

Where, as in the instant case, the object of a conspiracy is to kill, the appropriate charge *may* be conspiracy to commit first degree murder. *See Bell v. State*, 48 Md.App. 669, 680, 429 A.2d 300 (1981) ("If one conspires to murder ... the conspiracy itself is the premeditating factor raising the underlying crime from a second to a first degree offense.").

*Id.* at 517 n. 2, 671 A.2d 495 (emphasis added) (parallel citation omitted). Thus, in *Gary*, it seems to us that the Court of Appeals implicitly left open whether it is appropriate to charge conspiracy to commit second degree murder.

In urging us to declare that conspiracy to commit second degree murder is not a criminal offense, appellant also directs us to cases from two jurisdictions that have so held. We turn to consider those cases.

In *People v. Hammond*, 187 Mich.App. 105, 466 N.W.2d 335, 337 (1991), the Michigan Court of Appeals held "that conspiracy to commit second-degree murder is not a criminal offense because such a conspiracy is logically inconsistent." There, Frederick Hammond pleaded guilty, *inter alia*, to conspiracy to commit second degree murder. After unsuccessfully moving to withdraw that plea, Hammond appealed his conviction for conspiracy to commit second degree murder on the ground that there is no such crime.[7]

7. Mich. Comp. Laws Ann. § 750.316 (West Supp.2000) corresponds to Md.Code, Art. 27, §§ 407–410. It provides, in part:

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

Quoting its decisions in *People v. Gilbert*, 183 Mich.App. 741, 455 N.W.2d 731, 735 (1990), and *People v. Hamp*, 110 Mich. App. 92, 312 N.W.2d 175, 180 (1981), the *Hammond* Court stated:

"Criminal conspiracy is a specific intent crime which arises from a mutual agreement between two or more parties to do or accomplish a crime or unlawful act. The gist of a criminal conspiracy is the specific, mutual agreement to perform the crime in question; the conspiracy statute provides punishment for the actual advance planning and agreement to perform the substantive criminal acts. However, second-degree murder is distinguishable from first-degree murder in that it does not require premeditation and in fact may not require a specific intent to kill."

\* \* \*

"Since prior 'planning' and 'agreement' are necessary, mandatory requisite elements of the crime of conspiracy, we find it analytically consistent to 'plan' to commit first-degree murder but logically inconsistent to 'plan' to commit second-

---

(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping.

(c) A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer. Section 750.317 (West 1991) is Michigan's counterpart to Md.Code, Art. 27, § 411. It states: "All other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same." Michigan's conspiracy statute provides that "[a]ny person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy." *Id.* § 750.157a.

degree murder. To prove a conspiracy to commit murder, it must be established that each of the conspirators have [sic] the intent required for murder and, to establish that intent, there must be foreknowledge of that intent. Foreknowledge and plan are compatible with the substantive crime of first-degree murder as both the crime of conspiracy and the crime of first-degree murder share elements of deliberation and premeditation. Prior planning denotes premeditation and deliberation. The elements of conspiracy, conversely, are incompatible and inconsistent with second-degree murder. One does not 'plan' to commit an 'unplanned' substantive crime. It is not 'absence' of the elements but the 'inconsistency' of the elements which lead [sic] us to conclude that one conspires to commit first-degree murder but not second-degree murder."

*Hammond,* 466 N.W.2d at 337 (alterations in original) (internal citations omitted).

Although the issue was framed somewhat differently in *People v. Cortez,* 18 Cal.4th 1223, 77 Cal.Rptr.2d 733, 960 P.2d 537 (1998), the California Supreme Court reached a similar conclusion. In that case, Mario Cortez and Mauricio Corletto engaged in a drive-by shooting; Cortez drove the car while Corletto leaned out of the window firing shots at members of a rival gang. The group returned fire and Corletto was fatally struck in the head.

Thereafter, a jury convicted Cortez of conspiracy to commit murder. The theory underlying the conspiracy charge was that Cortez "agreed and conspired with Corletto to murder one or more members of the [rival gang] by means of a drive-by shooting." *Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 539. On appeal to the California Court of Appeal, Cortez argued that the trial judge erred in failing to require the jury to determine the degree of the murder that was the underlying object of the conspiracy. The intermediate appellate court rejected that argument and affirmed. Cortez then appealed to the California Supreme Court.

Two years earlier, in *People v. Swain,* 12 Cal.4th 593, 49 Cal.Rptr.2d 390, 909 P.2d 994, 998 (1996), the California

Supreme Court concluded that a conspiracy to commit murder is necessarily a conspiracy to commit intent-to-kill murder. *Id.* 49 Cal.Rptr.2d 390, 909 P.2d at 1001. The *Swain* court expressly left open, however, the question of whether conspiracy to commit specific intent-to-kill second degree murder is a viable offense, and if so, the appropriate punishment. *Id.* 49 Cal.Rptr.2d 390, 909 P.2d at 1002–04. Confident that Cortez's appeal provided the appropriate vehicle to resolve those questions, the court "granted review to determine whether the crime of conspiracy to commit murder is divisible into degrees with differing punishments, or whether all conspiracies to commit murder are conspiracies to commit first degree murder as a matter of law." *Cortez,* 77 Cal.Rptr.2d 733, 960 P.2d at 539.

Before turning to consider the discussion in *Cortez,* it is helpful to highlight several sections of the California Penal Code pertinent to that decision. By statute, "[m]urder is the unlawful killing of a human being ... with malice aforethought." Cal.Penal Code § 187(a) (West 1999). California's counterpart to Md.Code, Art. 27, §§ 407–411 states, in pertinent part:

> All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under [certain sections], *or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death,* is murder of the first degree. All other kinds of murders are of the second degree.

Cal.Penal Code § 189 (West Supp.2000) (emphasis added); *cf. Cortez,* 77 Cal.Rptr.2d 733, 960 P.2d at 539 n. 1 (indicating that the emphasized language was added to the statute after Corletto was killed).

In addition, California's legislature has codified in Cal.Penal Code § 182 a distinctive scheme to adjudge criminal conspiracy. As relevant to this case, that section provides:

(a) If two or more persons conspire:

 (1) To commit any crime.

* * *

They are punishable as follows:

* * *

When they conspire to commit ... [a] felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of ... that felony. If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, *except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.*

Cal.Penal Code § 182 (West 1999) (emphasis added). *Compare id., with* Md.Code, Art. 27, § 539 ("If two or more persons conspire to commit any crime defined by this subtitle, each of such persons is guilty of conspiracy and shall be deemed a felon subject to the same punishment as if he had committed the crime which he conspired to commit, whether or not any act be done in furtherance of the conspiracy.").

California Penal Code § 182 played a pivotal role in the court's analysis. Indeed, the court went to great pains to trace the legislative history of that section, as well as the corresponding changes in the case law applying and interpreting section 182. In so doing, the court was forced to deal squarely with a previous statement it had made in *People v. Horn*, 12 Cal.3d 290, 115 Cal.Rptr. 516, 524 P.2d 1300 (1974).

There, in a footnote, the court discussed the above-quoted excerpt from Cal.Penal Code § 182, stating:

As this language is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree. *Only* if the trier of fact fails to determine the degree is a conspiracy to commit murder punished as one to commit first degree murder. Since the Legislature has authorized a verdict of conspiracy to commit second degree murder, it clearly does not believe that crime to be a logical impossibility.

*Horn*, 115 Cal.Rptr. 516, 524 P.2d at 1305 n. 5.

The *Cortez* court declared that *Horn*'s interpretation of Cal.Penal Code § 182 was dicta. *Cortez*, 77 Cal.Rptr.2d 733, 960 P.2d at 545. Moreover, the court concluded that "reading the punishment provisions of [Cal.Penal Code § 182] as establishing the substantive offense of conspiracy to commit *second degree* [intent-to-kill] murder would lead to illogical results." *Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 546. According to the court, one such result was the inherent conflict between the analysis contained in note 5 of the *Horn* opinion, and "the general proposition, expressly embodied in the punishment language of [Cal.Penal Code § 182], that a defendant should receive the *benefit* of a jury's failure to designate the degree of the target offense of the conspiracy." *Id.* The *Cortez* court thus concluded that all conspiracy to commit murder is conspiracy to commit premeditated and deliberated first degree murder. *Cortez*, 77 Cal.Rptr.2d 733, 960 P.2d at 538, 546. The court reasoned:

[C]onspiracy is a specific intent crime requiring both an intent to agree or conspire and a further intent to commit the target crime or object of the conspiracy. Murder that is premeditated and deliberated is murder of the first degree. " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may

follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' "

Consequently, it logically follows that where two or more persons conspire to commit murder—i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder—each has acted with a state of mind "functionally indistinguishable from the mental state of premeditating the target offense of murder." The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder—hence all murder conspiracies are conspiracies to commit first degree murder, so to speak. More accurately stated, conspiracy to commit murder is a unitary offense *punishable* in every instance in the same manner as is first degree murder under the provisions of [Cal.Penal Code § ] 182.

*Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 542 (citations omitted).[8]

The discussion did not end there. The California Supreme Court explained that, in granting Cortez's request for review, it asked the parties to address any error that may have arisen from the trial judge's failure to instruct the jury on premeditation and deliberation. *Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 546. The court opined that, in light of its holding, "it follows logically that there was no occasion or requirement for the jury to determine the 'degree' of the underlying target offense of murder, and thus no need for specific instruction on premeditation and deliberation respecting the conspiracy count." *Id.* Thus, in the court's view, the trial judge was only required to instruct the jury on the dual intents of conspiracy and the "basic elements of murder" (murder is the unlawful killing of a human being with malice aforethought, i.e., the intent to kill). *Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 547.

Justice Joyce L. Kennard dissented in *Cortez*, criticizing what she framed as the majority's "conclu[sion] that conspira-

---

**8.** As indicated, an overt act is not required to establish criminal conspiracy in Maryland.

cy to murder is a unitary crime requiring proof of only intent to kill, the mental state of second degree murder, but subject to the punishment for first degree murder." *Id.* 77 Cal. Rptr.2d 733, 960 P.2d at 552 (Kennard, J., dissenting). Justice Kennard expounded upon this point in a footnote:

> The majority contends that it does no such thing but that it "merely recogniz[es] that the mental state required for conviction of conspiracy to commit express malice murder *necessarily equates with and establishes* the mental state of deliberate and premeditated first degree murder." Despite its protestations, however, the majority nevertheless refuses to require the jury to find the existence of the elemental facts of premeditation and deliberation, as a jury must find before convicting a defendant of first degree murder. Instead, it holds that intent to kill (the mental state of second degree murder) is the only mental state the jury need find to convict the defendant of conspiracy to murder, the punishment for which is that of first degree murder. Judicial presumption of premeditation and deliberation, however, is no substitute for jury fact-finding on those issues.

*Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 552 n. 2 (Kennard, J., dissenting) (alteration in original) (citation omitted).

We find persuasive Justice Kennard's view that it is, indeed, factually possible for two or more individuals to conspire without premeditation and deliberation. *Id.* 77 Cal.Rptr.2d 733, 960 P.2d at 553–54 (Kennard, J., dissenting). She reasoned:

> By creating the separate crimes of (1) first degree murder for killings in which the killer acts not only with the intent to kill but with premeditation and deliberation, and (2) second degree murder for killings in which the killer acts with the intent to kill but *without* premeditation and deliberation, the Legislature has recognized that the intent to kill can exist without premeditation and deliberation. Contrary to the majority, there is no logical reason why a sudden intent to kill that is neither " ' "considered beforehand" ' " nor " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and

against the proposed course of action," ' " cannot arise in two persons just as it can arise in one.

Conspiracies do not require formal expressions of agreement or advance planning. For example, with a shout of "let's get him," two friends who have been drinking all night in a bar can, without premeditation and deliberation, impulsively form and share the intent to kill when their sworn enemy walks in. Similarly, a sudden and unexpected encounter on disputed turf between groups from two different gangs can similarly lead to a spontaneous and unreflective agreement to kill. Juries are capable of distinguishing between first degree murder conspiracies requiring premeditation and deliberation and second degree murder conspiracies requiring only intent to kill.

*Id.* (Kennard, J., dissenting) (citations omitted).

Justice Kennard is not alone in her view. As she points out, the Fifth and Ninth Circuits have also recognized varying degrees of murder as the object offense of criminal conspiracy. *See United States v. Croft,* 124 F.3d 1109 (9th Cir.1997); *United States v. Chagra,* 807 F.2d 398 (5th Cir.1986), *cert. denied,* 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987). Several statutory provisions are pertinent to our own review of those cases. The United States Code defines "murder" as follows:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a) (1994). Moreover, as relevant here, 18 U.S.C. § 1117 provides that "[i]f two or more persons conspire

to violate section 1111 [or] 1114 ... of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."

In *Chagra*, 807 F.2d 398, the defendant was convicted of conspiring to commit the second degree murder of a federal judge, in violation of 18 U.S.C. §§ 1111, 1114,[9] and 1117. Similar to appellant's argument here, the defendant in *Chagra* averred that conspiracy to commit second degree murder is not a crime. *Id.* at 400–01. In rejecting that argument, the Fifth Circuit stated:

What is required is that the defendant agree with another to accomplish an illegal objective and that at the time of agreement the defendant also have the state of mind required to commit the substantive crime. The two states of mind are almost always one, or tend to collapse into one, but it is nonetheless important that the inquiries be made separately.

\* \* \*

... Conspiracy ... is a crime independent of the substantive offense that was its object. The focus of a conspiracy offense is upon agreement. The inquiry is into defendant's intent at the time of the illegal agreement or conspiracy,

---

9. 18 U.S.C. § 1114 (Supp. IV 1998) provides:

Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished—

(1) in the case of murder, as provided under section 1111;

(2) in the case of manslaughter, as provided under section 1112; or

(3) in the case of attempted murder or manslaughter, as provided in section 1113.

and that state of mind can certainly be to impulsively kill such as, "yes! let's kill the judge."

*Id.* at 401–02.

In *Croft*, 124 F.3d 1109, certain members of a spiritual community in Oregon determined that it was necessary to assassinate a number of the community's enemies, including Charles Turner, Oregon's U.S. Attorney. A "hit team" was subsequently formed to kill Turner, and Sally–Anne Croft was designated to supply the team with money for weapons and passports. Although handguns were purchased and surveillance on Turner was initiated, the plan eventually unraveled and no attempt was made on Turner's life.

Sometime thereafter, federal and state law enforcement officials learned of the plan and the conspirators were indicted. . Five of the conspirators agreed to testify against Croft and another co-conspirator in exchange for plea agreements. After a month-long trial and four days of deliberation, a jury convicted Croft and her co-defendant of conspiracy to commit murder in violation of 18 U.S.C. §§ 1111, 1114, and 1117.

On appeal to the Ninth Circuit, Croft challenged the adequacy of the district court's intent instruction, which provided:

[T]he United States Code provides in pertinent part that murder is the unlawful killing of a human being with malice aforethought . . . In order to find that either defendant is guilty of [the offense of conspiring to murder the United States Attorney], the government must prove each of the following elements beyond a reasonable doubt:

First, . . . there was an agreement between two or more persons to kill then United States Attorney Charles Turner with malice aforethought.

Second, the defendant willfully became a member of the conspiracy, knowing of its objectives and specifically intending to help accomplish the murder of . . . Turner.

\* \* \* \*

A person only becomes a member of an unlawful conspiracy if she willingly participates in the unlawful agreement

with the intent to advance the objective of the conspiracy, even though that person may not have knowledge of all of the details of the conspiracy.

\* \* \* \*

The term "willfully" ... means to act or participate voluntarily and intentionally and with specific intent to help accomplish the murder of ... Turner.

*Croft*, 124 F.3d at 1122 (alterations in original).

Croft argued that, *inter alia*, murder as defined by 18 U.S.C. § 1111(a) requires a premeditation element that was not contained in the instruction. *Id.* The Ninth Circuit responded:

Section 1111(a) ... encompasses both first- and second-degree murder. The indictment in this case included no element of premeditation; it accordingly alleged only second-degree murder as the object of the conspiracy. *See United States v. Harrelson*, 754 F.2d 1153, 1174 (5th Cir. 1985). Although our circuit has not yet addressed the question, the Fifth Circuit has held that it is logically possible to conspire to commit second-degree murder. *United States v. Chagra*, 807 F.2d 398, 401–02 (5th Cir. 1986). We accept that view, and conclude that the indictment here alleged that crime. As a consequence, it was not error for the district court to omit the element of premeditation in its instructions.

*Id.* at 1122–23 (footnote omitted).

As our discussion of *Hammond*, 187 Mich.App. 105, 466 N.W.2d 335, and the majority opinion in *Cortez*, 18 Cal.4th 1223, 77 Cal.Rptr.2d 733, 960 P.2d 537, makes clear, appellant's position that conspiracy to commit second degree murder does not constitute a criminal offense is superficially seductive. As we see it, however, those courts took too narrow a view of conspiracy to murder. The Michigan Court of Appeals presumed that " '*prior* "planning" ' " is a required element for criminal conspiracy, and, further, that proof of an intent to kill requires " '*foreknowledge* of that intent.' " *Ham-*

*mond,* 466 N.W.2d at 337 (emphasis added) (quoting *Hamp,* 312 N.W.2d at 180). Similarly, the California Supreme Court concluded that proof of the conspiracy's dual intents "necessarily establishes premeditation and deliberation of the target offense of murder." *Cortez,* 77 Cal.Rptr.2d 733, 960 P.2d at 542. Although it is difficult to quantify the impact of Cal.Penal Code § 182's sentencing presumption on the decision of the *Cortez* court, in our view, both courts ignored the possibility that a conspiracy to murder, like an intent to kill formulated by an individual, may result from a spontaneous decision.

To be sure, an agreement is a necessary predicate to a conspiracy, but the agreement "need not be spoken or formal so long as there is a meeting of the minds reflecting a unity of purpose and design." *Monoker,* 321 Md. at 221, 582 A.2d 525. On the other hand, there is no requirement that the conspirators reach an agreement to commit the offense well in advance of its actual commission. In other words, an agreement to commit a crime could be arrived at virtually instantaneously with the commission (or attempt) of that crime. Justice Kennard recognized this phenomenon when she hypothesized about an encounter between rival gangs. *Cortez,* 77 Cal. Rptr.2d 733, 960 P.2d at 554 (Kennard, J., dissenting). Similarly, in *Chagra,* the Fifth Circuit contemplated an impulsive decision to kill a judge. *Chagra,* 807 F.2d at 402. Indeed, we can conceive of numerous examples of a spontaneous agreement to kill.

In sum, we are not persuaded that the dual elements of conspiracy necessarily establish premeditation and deliberation. Admittedly, unreflective agreements to kill between conspirators will be few and far between; the vast majority of conspiracies to murder will most certainly involve premeditation and deliberation and, thus, qualify as conspiracy to commit first degree murder. Statistical unlikeliness is not a sufficient ground, however, to invalidate a legally cognizable crime. We are unwilling to remove from the province of the jury the determination of whether the aggravating factors of premeditation and deliberation are present in a given case. It is properly left to the jury to ascertain whether the State has

proven the aggravating elements of conspiracy to commit first degree murder, or if it has, instead, only established the elements sufficient to convict a defendant of the lesser included offense of conspiracy to commit second degree/common law murder.

It is also noteworthy that the State could simply have charged appellant with conspiracy to commit murder, without designating the specific degree of murder. That may have obviated the difficulty presented here. Instead, the indictment charged appellant with conspiracy to commit murder and conspiracy to commit second degree murder. The indictment evidences a clear attempt by the State to track the statutory form for murder prescribed in Md.Code, Art. 27, § 616. That section provides:

In any indictment for murder or manslaughter, or for being an accessory thereto, it shall not be necessary to set forth the manner or means of death. It shall be sufficient to use a formula substantially to the following effect: "That A.B., on the. . . . . day of. . . . . nineteen hundred and. . . . ., at the county aforesaid, feloniously (wilfully and of deliberately premeditated malice aforethought) did kill (and murder) C.D. against the peace, government and dignity of the State".

Although the Legislature, through Md.Code, Art. 27, § 616, has provided a statutory form pursuant to which a defendant may be charged with murder, it is well-settled that "the common law forms are still permissible." *Wood,* 191 Md. at 667, 62 A.2d 576; *see Hardy,* 301 Md. at 137, 482 A.2d 474. In other words, the State may charge common law murder in lieu of the statutory form contained in Md.Code, Art. 27, § 616. *Hardy,* 301 Md. at 137, 482 A.2d 474. In that context, what the Court of Appeals said in *Hardy,* 301 Md. at 138, 482 A.2d 474, is pertinent:

[O]ne may be convicted of first-degree murder under an indictment charging common-law murder. Our predecessors originally noted this proposition in *Davis v. State,* [39 Md. 355, 374 (1874) ]:

> When, therefore, a person is indicted for murder, in the technical language of the common law, he is charged with a crime, which in its proper sense, includes all circumstances of aggravation, and as all minor degrees are included in the major, he is liable to be convicted of the inferior, as well as of the higher grades of that offense, and *vice versa.*
>
> *Based on these principles an indictment charging common-law murder is sufficient to sustain a conviction for either first or second-degree murder or manslaughter. Evidence presented at trial and the verdicts will determine the level of criminal culpability and hence the punishment for the offense.*

(Emphasis added).

As discussed above, appellant was charged under the conspiracy to commit second degree murder count of the indictment with conspiring "to feloniously with malice aforethought, kill and murder Eddy Arias in violation of the **Common Law** of Maryland." Because, at common law, "murder" was defined as "a killing with 'malice aforethought,'" *Wood,* 191 Md. at 666, 62 A.2d 576 (citation omitted), we are satisfied that the count charging what has been characterized as conspiracy to commit second degree murder adequately charged conspiracy to commit murder, thereby allowing for a conviction of conspiracy to commit murder in the second degree. *Cf. Campbell,* 325 Md. at 496, 501, 601 A.2d 667 (stating that "[w]hen the object of a conspiracy is the commission of a crime, alleging that fact in the charging document obviously would be a sufficient statement of the conspiracy's object," and rejecting the notion that "when the commission of a crime is the object of the indictment, that crime must be charged with the same specificity as if it were the substantive charge").

Our conclusion unmasks the flaw in appellant's argument, and reveals the windfall that would result from a holding in his favor. Under appellant's reasoning, assuming the State proved that he was one of the persons who attacked Mr. Arias, the State necessarily proved conspiracy to commit first degree

murder. Because the trial judge granted appellant's motion for judgment of acquittal as to the conspiracy to commit first degree murder, appellant contends that the court necessarily acquitted him of conspiracy to commit second degree murder, and thus rendered conviction on any conspiracy to murder charge impossible.

A verdict of guilty with respect to a lesser included offense ordinarily results from the State's failure to prove an aggravating element. Appellant overlooks that when a defendant is charged with first degree murder, regardless of the quantum of proof, a jury may nonetheless opt to convict for the lesser included offense of second degree murder. In this case, it makes no sense to dismiss a lesser included offense merely because, as appellant argues, the State actually proved more.

The case of the "twilight burglar," charged with burglary prior to 1994, illustrates our point. Until the General Assembly enacted 1994 Md. Laws, Chaps. 712, burglary, as defined at common law, remained the law of Maryland. *See McGraw v. State*, 234 Md. 273, 275, 199 A.2d 229, *cert. denied*, 379 U.S. 862, 85 S.Ct. 124, 13 L.Ed.2d 64 (1964); Richard P. Gilbert & Charles E. Moylan, Jr., *Maryland Criminal Law: Practice and Procedure* § 11.0, at 119 (1983). "Common law burglary is the breaking and entering of the dwelling of another, *during the nighttime*, with the intent to commit a felony therein." *Muir v. State*, 64 Md.App. 648, 653, 498 A.2d 666 (1985) (emphasis added), *aff'd*, 308 Md. 208, 517 A.2d 1105 (1986). *But see* 1994 Md. Laws, Chaps. 712 (enacting current Md.Code, Art. 27, § 29 and thereby eliminating the nighttime requirement).[10] The statute that formerly governed common law burglary provided for an allowable punishment up to twenty years in prison. Md.Code (1957, 1992 Repl.Vol., 1993 Supp.), Art. 27, § 29 (repealed 1994) ("former Art. 27"); *see* Gilbert & Moylan, *supra*, § 11.0, at 119 n. 3. What was

---

**10.** Current Md.Code, Art. 27, § 29(a) provides that "[a] person may not break and enter the dwelling of another with the intent to commit theft or a crime of violence." An express purpose of 1994 Md. Laws, Chap. 712 was the "aboli[tion of] the distinction between burglary and daytime housebreaking."

known as "statutory burglary" was contained in former Art. 27, § 30(a). *See Reagan v. State*, 4 Md.App. 590, 594, 244 A.2d 623 (1968). Section 30(a) provided that "[e]very person . . . who shall break and enter any dwelling house in the nighttime with the intent to steal, take or carry away the personal goods of another of any value therefrom shall be deemed a felon, and shall be guilty of the crime of burglary."

The obvious void for *daytime* breaking was filled with former Art. 27, § 30(b), which stated:

Any person . . . who shall be convicted of the crime of breaking a dwelling house in the daytime with intent to commit murder or felony therein, or with intent to steal, take or carry away the personal goods of another of any value therefrom, shall be guilty of a felony, and upon conviction thereof, shall be sentenced to the penitentiary for not more than ten years.

Although remedial in nature, the daytime breaking statute itself created uncertainty. On the one hand, a strict interpretation of former Art. 27, § 30(b)'s use of the word "daytime" might have suggested that the State was required to prove the breaking occurred in the daytime as an essential element of the offense. *See Henry v. State*, 20 Md.App. 296, 302, 315 A.2d 797, *vacated on other grounds*, 273 Md. 131, 328 A.2d 293 (1974). On the other hand, use of the term "daytime" may have meant "anything less than demonstrated nighttime." *Id.* at 302–03, 315 A.2d 797.

We resolved the issue in *St. Clair v. State*, 1 Md.App. 605, 232 A.2d 565 (1967). In that case, the State proved that the defendant broke a dwelling, and removed goods from that dwelling, but was unable to establish whether the breaking occurred during the day or at night. A jury convicted the defendant of daytime housebreaking in violation of former Art. 27, § 30(b). On appeal, the defendant challenged the conviction on the ground that, *inter alia*, "there was no evidence produced to establish that the breaking occurred in the daytime." *Id.* at 608, 232 A.2d 565. We concluded that former Art. 27, § 30(b) did not require proof of "daytime." *Id.* at 622,

232 A.2d 565. Instead, we determined that daytime housebreaking as a lesser included offense, resulting from non-proof of "nighttime" as required by former Art. 27, § 30(a) and at common law. *Id.; see Williams v. State,* 100 Md.App. 468, 477, 641 A.2d 990 (1994). Thus, we drew an important distinction between proof of non-nighttime (limiting the conviction to daytime housebreaking) and non-proof of nighttime (allowing for a conviction of daytime housebreaking). *See Henry,* 20 Md.App. at 303–04, 315 A.2d 797. As we later explained in *Williams,* 100 Md.App. at 477, 641 A.2d 990, had we not drawn that distinction, "the 'twilight burglar,' where it could not be proved that the breaking took place either in the nighttime or in the daytime, might find undeserved safe haven in the eye of the hurricane."

Further illustration can be found in a situation in which a defendant is charged with second degree depraved heart murder. Second degree depraved heart murder involves an unintentional killing of another while engaged in potentially life-threatening behavior. *See Ashe v. State,* 125 Md.App. 537, 548, 726 A.2d 786, *cert. denied,* 354 Md. 571, 731 A.2d 969 (1999); *Williams,* 100 Md.App. at 484–85, 641 A.2d 990. Accordingly, the defendant is said to have acted with a *mens rea* sufficient to support a finding that he or she, "conscious of such risk, acted with extreme disregard of the life-endangering consequences." MPJI–Cr 4:17.8, at 258; *see Pagotto v. State,* 127 Md.App. 271, 277, 732 A.2d 920, *cert. granted,* 356 Md. 495, 740 A.2d 613 (1999); *Ashe,* 125 Md.App. at 548, 726 A.2d 786; *Williams,* 100 Md.App. at 484, 641 A.2d 990 (quoting MPJI–Cr 4:17.8); *see also Robinson v. State,* 307 Md. 738, 744–45, 517 A.2d 94 (1986).

Obviously, the depraved heart *mens rea* does not require an intent to kill. Nevertheless, a defendant charged with second degree depraved heart murder is not entitled to acquittal merely because she establishes that she indeed acted with a premeditated and deliberate intent to kill, and therefore should have been charged with first degree murder. *Cf. Williams,* 100 Md.App. at 477, 641 A.2d 990 ("Second-degree

murder is frequently described as unpremeditated murder. It does not, however, require proof of nonpremeditation; it is simply an available alternative when there is non-proof of premeditation."). Neither is she protected by a showing that she acted with an intent to harm. *See Robinson*, 307 Md. at 745, 517 A.2d 94 (acknowledging that the "authorities say no more than that the crime [of depraved heart murder] may be committed absent intent to injure" and stating further that "[t]hey do not hold that the crime is not committed if there is an intent to injure").

 Applying our reasoning to this case, even if, as appellant urges, the State proved more, i.e., that appellant acted with premeditation and deliberation, the conspiracy to commit second degree murder conviction is not invalid. Moreover, the jury was instructed on the dual conspiracy elements and was required, in the context of the attempted second degree murder charge, to find that appellant intended to kill Mr. Arias in order to convict. The elements of common law/second degree murder were presented to the jury, which appropriately rendered its own determination.

Accordingly, we hold that conspiracy to commit second degree murder is a crime in Maryland. Therefore, the circuit court had subject matter jurisdiction over that charge and the conviction.

Appellant also offered an "alternative" argument in his brief, stating, in part:

Even if conspiracy to commit second degree murder is a legally cognizable crime, the constitutional and Maryland common law prohibition against double jeopardy precluded Mr. Mitchell's conviction on that count. Inherent in the trial court's decision to grant a judgment of acquittal on the first degree murder charges was a finding that there was insufficient evidence of premeditation. A type of premeditation, i.e., prior agreement with intent to kill, is a critical component of any conspiracy to murder. Therefore, the court's acquittal of Mr. Mitchell on the first degree murder

charges should have barred the jury's consideration of the second degree conspiracy charge as well.

In our view, this argument does little more than revive those issues discussed at length above. Therefore, we consider it unnecessary to address this "alternative" contention further.

### III.

Appellant made a motion for judgment of acquittal on all counts at the close of the State's case. The court granted appellant's motion with respect to the charges of attempted first degree murder, conspiracy to commit first degree murder, and possession of a firearm after the conviction of a felony drug offense, but stated that "[t]he rest of the Counts will stand."

Appellant subsequently called his only witness, Detective Best, to the stand in order to admit into evidence a photograph of Gregory Ellis. Appellant points out in his brief that because Detective Best was only asked five questions, and appellant then rested his case, he "did not then have the opportunity to renew [his] motion for judgment of acquittal." We disagree.

A review of the trial transcript indicates that after the photograph was admitted, appellant had the opportunity to renew his motion for judgment of acquittal, but failed to do so:

[APPELLANT'S COUNSEL]: No further questions.

THE COURT: Thank you very much Detective Best.

[APPELLANT'S COUNSEL]: Defendant rests.

THE COURT: All right. Any rebuttal?

[PROSECUTOR]: No rebuttal.

THE COURT: No rebuttal.

All right, ladies and gentlemen. Now we are ready for the instructions.

Under Md. Rule 4-324(c), "[a] defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not

granted.... In so doing, the defendant withdraws the motion." Accordingly, appellant withdrew his motion for judgment of acquittal on the remaining counts. In order to preserve this issue for appellate review, appellant was required to renew his motion for judgment of acquittal at the close of *all* of the evidence. *Ennis v. State,* 306 Md. 579, 585, 510 A.2d 573 (1986) (stating that Md.Code, Art. 27, § 593 and Md. Rule 4–324 "have been construed to preclude appellate courts of this state from entertaining a review of the sufficiency of the evidence, in a criminal case tried before a jury, where the defendant failed to move for judgment of acquittal at the close of all the evidence"); *Dumornay v. State,* 106 Md.App. 361, 375, 664 A.2d 469 (1995) (same); *Briggs v. State,* 90 Md.App. 60, 66, 599 A.2d 1221 (1992). Appellant has not referred us to any legal authority that relieved him from his obligation to renew his motion, merely because he previously made such a motion at the end of the State's case, and then called only one witness to answer just a few questions.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

MURPHY, Chief Judge, dissenting.

I agree that the trial judge did not abuse her discretion in refusing to grant a mistrial. I also agree that the evidence was sufficient to support appellant's convictions of the offenses properly submitted to the jury. I dissent, however, from that portion of the majority opinion that affirms appellant's conviction for conspiracy to commit second degree murder.

The State's evidence against appellant was sufficient to support a conviction for conspiracy to commit first degree murder, but the trial judge granted appellant's motion for judgment of acquittal on that charge. That ruling, in my judgment, disposed of the conspiracy to murder charges. The conspiracy to commit second degree murder should not have been submitted to the jury.

Conspiracy to commit murder means conspiracy to commit *first degree murder.* It is the agreement to kill that constitutes "the premeditating factor." *Bell v. State,* 48 Md.App. 669, 680, 429 A.2d 300, *cert. denied,* 291 Md. 771 (1981) (citations omitted).

Deliberation and premeditation are essential elements of an agreement to participate in an intentional killing. In this case, the jurors were instructed that, to convict appellant of conspiracy to commit murder in the second degree, "the State must prove that [appellant] ... entered into the agreement with the intent that murder in the second degree ... be committed." In accordance with those instructions, the jurors convicted appellant of a charge that the court had already resolved in his favor. I would therefore reverse (only) appellant's conviction for conspiracy to commit second degree murder.